Filed 8/9/13 (unmodified opn. attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re D.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>A.G. et al.,<br><br>    Defendants and Appellants. | A135254<br>(San Francisco County<br>Super. Ct. No. JD08-3153 C-E)<br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

The opinion that was filed July 11, 2013, is modified as follows:

1.     Delete the second sentence of the third paragraph of section II.B. and replace it with "Here, the juvenile court granted parental visitation following termination of reunification services at the 18-month review hearing, which is governed by section 366.22."

2.     At the end of the sixth paragraph of section II.B., add the following two-paragraph footnote 7:

"In a petition for rehearing, father (joined by mother) again argues we should review the juvenile court's order for substantial evidence, and he claims to find support in *In re A.M.* (2013) 217 Cal.App.4th 1067 [2013 Cal.App. Lexis 541], an opinion recently ordered published by our colleagues in Division One.  His reliance on this case is misplaced.  In *A.M.*, the juvenile court bypassed reunification services for a mother under

two exceptions to services listed in section 361.5, subdivision (b), but then ordered services a few months later after the mother filed a section 388 petition. (*A.M.* at pp. 10, 13-14.) *A.M.* held that the juvenile court had erred by failing to make the specific findings required under section 361.5, subdivision (c) before ordering services for the parents. (*A.M.* at pp. 15-20.) *A.M.* concluded that these findings were not excused simply because mother made her request for services by way of a section 388 petition since section 361.5 expressly requires the findings—a requirement now explicitly set forth in section 388 following an amendment in 2012. (*A.M.* at pp. 16-18 & fn. 2.) It is true that *A.M.* reviewed the juvenile court's order for substantial evidence. (*Id.* at pp. 21-22.) This was proper, however, because orders regarding the bypass provisions of section 361.5, subdivision (b) are reviewed for substantial evidence. (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 196.) But *A.M.* stressed the differences between the evidentiary burdens and findings applicable to section 388 petitions, as opposed to those applicable in proceedings brought under the bypass provisions, which have never been an issue in this case. (*A.M.* at pp. 20-21.)

"Father also contends that the best-interest determination under section 388 is 'subjective and less precise' than the 'objective finding of detriment' that was required before the termination of visitation, as set forth in *In re Manolito L.*, *supra*, 90 Cal.App.4th at page 760, and that such a factual determination should be reviewed for substantial evidence rather than for an abuse of discretion. We reject the argument for two reasons. First, *Manolito L.* reviewed the juvenile court's termination of visitation after making a detriment finding *for abuse of discretion*. (*Id.* at p. 756.) Second, while we question whether the two standards are so different in this context, we note that the juvenile court here made a finding of detriment. Father's and mother's petitions for rehearing are denied."

The addition of the footnote will not necessitate the renumbering of footnotes.

The modification does not change the appellate judgment. (Cal. Rules of Court, rule 8.264(c)(2).)

Appellants' petitions for rehearing are denied.


Dated:_____


_____P.J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re D.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. A.G. et al., Defendants and Appellants. | A135254 (San Francisco County Super. Ct. Nos. JD08-3153 C-E) |

Appellants S.B. (father) and A.G. (mother) appeal from an order by the juvenile court terminating their rights to visit their three youngest children. Visitation had been authorized in July 2010 after the court terminated reunification services, and visits ensued intermittently for a year and a half. But the boys engaged in troubling behavior during and after these visits, and their attorney, joined by respondent San Francisco Human Services Agency (Agency), sought to end the visits by filing a request to change the July 2010 order under Welfare and Institutions Code section 388.[1] This request was granted by the juvenile court in April 2012, and it is this order from which the parents appeal. We conclude that the preponderance-of-the-evidence burden of proof applied at the hearing and that the boys and Agency demonstrated sufficient "new evidence" under section 388 to justify changing the previous court order. We therefore affirm.

---

[1] All statutory references are to the Welfare and Institutions Code.

1

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Father and mother are the parents of six children together, with their three youngest, all boys, being the subject of this appeal.[2]  Father and mother also have two children each from other relationships.  The case began when the Agency filed a dependency petition regarding all of the children in June 2008.  In October 2008, the children were adjudged dependents of the court.  In support of its order, the juvenile court made a number of findings, including the following:  the parents had a relationship characterized by domestic violence that was witnessed and imitated by the children; a female child reported sexual abuse by her half brother; the children reported that the parents used excessive physical discipline; mother had mental health problems requiring therapy; father had a possible drinking problem requiring assessment; father physically abused his children from another relationship; and several children of one or both parents were former dependents of the court.  (§ 300, subds. (b), (j).)

A reunification period of over a year and a half followed, and during it the boys were placed together in three different foster homes.  Status reports filed during this time described worrisome behaviors by the boys.  The younger brother suffered possible developmental delays, which may have been due to brain bleeding at birth.  The middle brother showed aggression when he was two years old and engaged in "head banging."  The older brother, according to his foster parents, "play[ed] with his feces all the time" when he was first placed in their care but stopped by early 2009.

Visits among the three boys, their siblings, and their parents during the reunification period sometimes involved violence among the children requiring "constant intervention and redirection."  According to a status report filed in October 2009, the

---

[2] The boys were aged 30, 18, and 5 months at the time they were removed from their parents' care.  They are currently seven, six, and five years old.  Although the boys' older siblings were the subject of the dependency proceedings, they are not subjects of this appeal.  For the sake of clarity, we shall refer to the three boys who are subjects of this appeal as the older brother, the middle brother, and the younger brother.

boys often acted out after visits. In early 2010, the social worker reported that the boys returned from visits with their parents "hyper and unable to self regulate." After visits, the older brother displayed increasingly aggressive behavior, the middle brother became "the most disregulated," and the younger brother was "often very fussy."

The parents were unable to reunify with their children. At the conclusion of a contested 18-month-review hearing in July 2010, the juvenile court terminated reunification services and ordered the boys to be placed with a maternal aunt (mother's sister), where they had been living for just over a month, and where they have remained ever since.[3]

At the July 2010 hearing, counsel for the Agency and the minors expressed concerns that parental visits during the reunification period caused the boys to engage in "continued aggression," "tantruming," and acting out. The court noted that the boys were still adjusting to their new placement, and it was hard to know why they were experiencing difficulty. The court ordered that mother receive supervised visitation twice a month, but added, "If it turns out that my call [regarding visitation] was wrong *or there's new information*, come back to the court and I'll reconsider what I ordered." (Italics added.) Father's visits with the boys had been stopped around the time father entered a drug-and-alcohol-treatment program. The court ordered monthly supervised visits with father, subject to various conditions, including a requirement that father begin drug testing and that father's sobriety be evaluated before the resumption of visitation.

The juvenile court renewed the boys' dependency status at post-permanency review hearings on January 13 and August 9, 2011, and on January 10, 2012, following the filing of status review reports describing the boys' progress in their aunt's care. According to these reports, the boys displayed a good deal of aggression when they were

---

[3] This court affirmed the juvenile court's July 2010 order in a nonpublished opinion. (*In re Leah B. et al.* (Mar. 30, 2011, A129155).) The juvenile court determined at a post-permanency review hearing on January 11, 2011, that setting a selection-and-implementation hearing under section 366.26 was not in the boys' best interest because they were not proper subjects for adoption, and no one was willing to accept legal guardianship.

first placed with their aunt, but they became less aggressive over time.  The social worker reported at one point that the older brother had shown great improvement in his behavior and emotional regulation, although his preschool continued to work with him on his physical behaviors and socialization skills, and he still at times screamed uncontrollably and acted out sexually.  The middle brother suffered from severe diarrhea early on in the placement that was attributed to anxiety.  He was asked to leave his preschool because of violent behavior, and he was disruptive at a second preschool placement, where he hit and bit students and teachers.  He was " 'severely delayed' " in his speech, scored " 'very low' " on an early childhood screening test, and suffered "severe behavioral and emotional issues" related to anxiety and posttraumatic-stress disorder.  The younger brother's behavior was reportedly normal, although he continued to experience developmental delays.

Mother was generally consistent in visiting the boys, but the boys were at times overwhelmed by the visits and experienced "episodes [of] emotional dysregulation" when they were with mother and were hard to control.  Father satisfied the court-imposed conditions to begin visitation.  He visited with the boys in November 2010, and in January, February, and March 2011, but then did not visit with them again until August 2011.  The two older brothers reacted negatively when father's visits resumed.  The older brother (then about five-and-a-half years old) had a bowel movement in his pants during the first resumed visit, had one a few days later at school even though he was not ill, and acted defiantly at home.  The middle brother (then about four-and-a-half years old and fully toilet trained) suffered diarrhea for three weeks following the visit.

The aunt supervised mother's twice-monthly visits with the boys.  Mother was frustrated that she was unable to exercise more of a parental role "outside of her sister's shadow."  But, according to the social worker, the boys were accustomed to their aunt and responded well to her consistency and structure.  Starting in August 2011, mother's visits were supervised by a third party, apparently because of the tension between mother and her sister.

A new social worker was assigned to the case in early September 2011. Based on discussions she had with the boys' aunt, teachers, and therapists, the social worker became "extremely concerned" about the boys' behavior and "the constant re-exposure to the biological parents with whom they experienced extreme violence and neglect," which led to a "spike" in "problematic behaviors," including aggression, biting, and scratching. The older brother appeared to react the strongest to visits with his parents. He acted out aggressively after a visit with father in late August 2011, and as of late September (a few months shy of his sixth birthday, when he was otherwise a fully toilet-trained kindergartener), he had had a bowel movement in his pants three out of four visits with father. The middle brother reportedly had less ability to focus at school after visits with his parents and became more emotional and aggressive, while the younger brother's behavior could "escalate very quickly at times."

The new social worker consulted with the director of the early trauma treatment center at San Francisco General Hospital, who had served as a consultant for the Agency for 27 years and had conferred with a previous social worker assigned to the case. The consultant recommended that all visits between the boys and their parents be terminated. The consultant stated that the boys' behavior showed "the classic characteristics of children whose brain development and emotional health has been derailed by their early experiences as they show emotional dysregulation, for example, in the form of the inability to control feces when under stress; severe aggression; lack of tolerance for frustration; fear of separation; chronic sleep problems and night terrors; violence towards teachers and peers; and food hoarding." She believed that visits with the parents were "a reminder of the traumatic experiences that they experienced when in their care," and that "their behaviors represent the trauma they suffered though they cannot articulate their pain."

In late October 2011, the aunt reported that the older brother had a bowel movement during a visit (apparently with mother) that was so bad his clothes had to be thrown away. He was able to avoid an accident during a different visit (this one with father), but he then had diarrhea for the two days following it. The younger brother, who

5

was almost four years old and fully toilet trained, also soiled his pants two days in a row after visits with father. The middle brother appeared withdrawn at school the day after an October visit with mother, and he pointed to "angry and sad faces" when his therapist asked him to describe how he felt after the visit. Because of his behavior at preschool, he was on the verge of being expelled just three months after starting there. According to the social worker, all three boys acted out following parental visits, and this pattern continued through early 2012.

Because the boys' distressing behavior persisted during and after parental visits in the fall of 2011, the boys' attorney sought to change visitation arrangements under section 388. In September, the attorney filed a petition to gradually reduce mother's visits, but this petition was later withdrawn. On November 1, the attorney filed two new section 388 petitions. The first requested that all visits between the boys and father be suspended because father had been inconsistent with visitation (often canceling at the last minute), and the boys were displaying "worrisome behaviors" after visiting with him. For example, after the most recent visit with father, the older two brothers (then nearly five and six years old) had numerous "accidents" and suffered "meltdowns," and the younger brother bit both of his brothers and displayed other "unusual behaviors." The second petition requested that all visits between the boys and mother be suspended because the boys were "experiencing and displaying great stress both during and after visits" with her. For example, the older brother (then nearly six years old) was unable to control his bowel movements and had an accident during a recent visit, and his teacher reported that he was "emotionally distraught and fragile" on days after visits. According to the petition, the two younger brothers also displayed "destructive behaviors" after visits.

The juvenile court denied the boys' ex parte request to suspend visits with father pending a hearing, but granted the request as to mother. Thus, all visits between the boys and mother were suspended as of November 7, 2011. On December 21, the Agency filed an addendum report with the juvenile court recommending that visits between the boys and both parents be terminated.

A contested hearing was held over four days in February, March, and April 2012. At the hearing, it was undisputed that the boys acted out and presented challenges, but the parties disputed whether the boys' behaviors were connected to visits with mother and father. The social worker testified that the boys' behavior had improved dramatically while in their relatives' care, but the boys regressed and acted out in extreme ways after parental visits. The day after a visit with father in late January,[4] the middle brother was expelled from his preschool (his fourth) because he bit the school director during a meeting about his aggressiveness toward other children. When his uncle went to pick him up from school, the middle brother bit him and scratched him, causing him to bleed, and his "tantrumming explosion" lasted about four hours. The older brother also had a difficult day at school the day after the visit with father and had to be sent home from kindergarten early. The social worker acknowledged on cross-examination that the boys had exhibited troubling behaviors for years, that some of their outbursts occurred days or weeks after visits with the parents, and that father acted appropriately during visits and showed warmth toward his children.

The boys' aunt testified that the boys displayed a lot of aggression when they first came to live with her, but their behavior had improved during the nearly two years that they were under her care. She reported that after parental visits, the older brother acted out in extreme ways at kindergarten, acted defiantly, and hit his brothers; the middle brother had nightmares several times during the night, cried a lot, experienced meltdowns, became sensitive and emotional, and threw toys; and the younger brother got anxious because of his older brothers' aggression and began modeling those behaviors. The aunt testified that "usually after a visit there is drama. It's two or more days of chaos" before she and her husband could get the boys to the point where they could play nicely together and not be so aggressive.

---

[4] The care coordinator who supervised this visit testified that before it began the boys exhibited hyperactive and impulsive behaviors, which were not typical for them. The boys appeared to enjoy their time with father, and father tried to control their hyperactivity.

7

The care coordinator who had supervised six visits between father and the boys testified that visits generally went well. The older brother usually smiled and ran to greet father, and all three hugged him, smiled, and laughed during the visits. And although the older brother soiled his pants during an October 2011 visit with mother, the boys appeared excited to see her and hugged her.

The consultant who had recommended that parental visits be terminated testified as an expert in children's mental heath issues, including attachment issues and child trauma, and their effect on children. She reiterated her view that the boys expressed extreme anxiety surrounding parental visits, appeared to have "very high levels of separation anxiety" from their aunt, and needed to be reassured that they would live with their aunt "forever." According to the consultant, the boys' behaviors were "classic[] manifestations of a condition that is called complex post traumatic stress disorder which sometimes from [*sic*] repeated and cumulative experiences of witnessing domestic violence, being verbally punished, [and] witnessing other children being physically, sexually or emotionally abused." She acknowledged that the boys displayed love for their parents and that visits often began well, but she explained that the boys would react negatively when their parents tried to control them by yelling or sending them out of the room. The consultant explained that the boys "are very easily triggered by any hint that they might be frightened," especially by father. She believed that parental visits should be terminated because they only served as "triggers of early pre-vocal memories that are frightening and dis-regulating."

The consultant was pressed on whether there was a connection between parental visits and the boys' acting out. She acknowledged on cross-examination that the middle brother's aggressive behavior had continued even after visits with mother were suspended. She testified that her recommendation to terminate visits was "not based on a causal [connection] between visits [and] bad behavior," but instead was "based on an overall case formulation that I have been trying to portray in the course of my testimony saying that these children are moralogically [*sic*], physiological[ly], cognitively, socially and emotionally showing intense serious manifestations of complex trauma disorder, so

that what they need is a predictable, structured, safe reliable day to day experience without revisiting triggering stimuli." The consultant also admitted on cross-examination that she had never directly observed the children but was relying on reports about them.

The juvenile court terminated all parental visits after finding that there was clear and convincing evidence that it was in the boys' best interest to terminate visitation based on a change in circumstances or new evidence. Mother and father both timely appealed. Father has filed a joinder in mother's opening brief to the extent her arguments benefit him, and mother has joined father's opening brief subject to the same qualification. (Cal. Rules of Court, rule 8.200(a)(5).)

## II.
### DISCUSSION

#### A. Standard of Review.

A ruling on a section 388 petition is "committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) Thus, we may not reverse unless the juvenile court exceeded the bounds of reason, and we have no authority to substitute our decision for that of the lower court where two or more inferences can reasonably be deduced from the facts. (*Id.* at pp. 318-319.)

Mother and father contend that we should review the order for substantial evidence. Father argues that in doing so we should bear in mind a clear-and-convincing burden of proof at the section 388 hearing. But, as we discuss more fully below, we conclude that a preponderance-of-the-evidence standard applies at a section 388 hearing to terminate parental visits during the post-reunification stage of dependency proceedings. Mother argues, after acknowledging that section 388 rulings are generally reviewed for abuse of discretion, that the substantial-evidence standard governs when the issue involves terminating parental visits. We disagree. The cases upon which she relies, unlike this one, arose in the context of visits being terminated during the reunification period and did not involve a section 388 petition. (E.g., *In re Mark L.* (2001)

9

94 Cal.App.4th 573, 580-581 & fn. 5 [reviewing denial of visitation after finding detriment to the minor under § 362.1, subd. (a)(1)(B)].)  We see no reason to depart from the more direct authority requiring us to review a ruling on a section 388 petition for an abuse of discretion.

### B.  Burden of Proof at the Section 388 Hearing

Section 388 allows interested parties to petition for a hearing to change or set aside a prior court order on the grounds of "change of circumstances or new evidence."  (§ 388, subd. (a)(1).)[5]  The burden of proof at any such hearing is on the moving party to show by a preponderance of the evidence both that there are changed circumstances or new evidence and that also a change in court order would be in the best interest of the child.  (§ 388, subd. (b); *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re M.V.* (2006) 146 Cal.App.4th 1048, 1059.)

As mentioned above, father argues that the moving parties were required to prove by clear and convincing evidence (instead of by a preponderance of the evidence) that continuing visits would harm the boys.  Father's argument relies on statutes and cases involving the denial of visits during the reunification period, when the focus of the proceedings is on trying to reunify parents with their children.  Denial of visitation during *this* critical period is governed by section 362.1, subdivision (a)(1)(B), which provides that a visitation order shall not jeopardize a child's safety.  Cases interpreting this statute refer to the specific findings that must be made to deny visitation during the reunification period, when there is a statutory presumption that visitation "shall be as frequent as possible, consistent with the well-being of the child" (§ 362.1, subd. (a)(1)(A)).  (E.g., *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1357-1358; *In re C.C.* (2009) 172 Cal.App.4th 1481, 1489-1490.)  Although we need not resolve the issue, we recognize that when the focus of dependency proceedings is on reunification, a higher standard of proof may be warranted before a court may deny visitation outright.  (*In re*

---

[5] Section 388 has been amended since the hearing under review in ways that do not affect our analysis.  (Stats. 2012, ch. 179, § 1; Stats. 2011, ch. 459, § 10.)  Our citation to the statute is to the version currently in effect.

10

*Dylan T.* (1998) 65 Cal.App.4th 765, 773 [visitation between incarcerated parent and minor may be denied only by proof of clear and convincing evidence that visitation would be detrimental to minor]; cf. Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2012 ed.) Disposition Hearing, § 2.129[5][b][iii], pp. 2-400-2-402 [standard of proof for denial of visitation an open question].)

Visitation during the post-reunification period, however, is governed by different statutes, which focus on permanency and stability for the child. Here, the juvenile court granted parental visitation following termination of parental rights at the 18-month review hearing, which is governed by section 366.22. Subdivision (a) of that statute provides that when a juvenile court terminates reunification services and orders a selection-and-implementation hearing under section 366.26, the court shall continue to permit the parent to visit the child unless it finds that visitation would be detrimental to the child, without specifying a burden of proof for such a finding.[6] No selection-and-implementation hearing was held here because the boys were found not to be proper subjects for adoption, and there was no one willing to accept legal guardianship. But if the juvenile court had held such a hearing here and ordered long-term foster care as the permanent plan (which it essentially did when it ordered the boys placed with their aunt in long-term care following the 18-month hearing), the relevant statute directs the court to authorize continued visitation with the parents unless it finds *by a preponderance of the evidence* that visits would be detrimental to the physical or emotional well-being of the child. (§ 366.26, subd. (c)(4)(C); see also Cal. Rules of Court, rule 5.720(b)(3)(B)(iii) [when court orders long-term foster care after 18-month hearing, court must continue visits unless visitation would be detrimental, with no burden of proof specified for finding of detriment].) In sum, although the statutes governing the period following termination of reunification services contemplate continuing parental visitation absent a

---

[6] Section 366.22 has been amended since the 18-month hearing was held in July 2010; however, the version in effect at the time the court terminated reunification services also provided that parents would be permitted to visit children pending the selection-and-implementation hearing absent a finding of detriment. (Stats. 2009, ch. 287, § 10; Stats. 2010, ch. 559, § 18; Stats. 2012 chs. 35, § 52, 208, § 2, 845, § 12, 846, § 20.3.)

finding of detriment, there is no indication that such a finding must be made by clear and convincing evidence.

Mother and father direct this court to no cases addressing the termination of parental visitation on a section 388 petition filed after reunification has ended and long-term foster care has been ordered (much less holding that the burden of proof on such a petition is by clear and convincing evidence), and we are aware of none. In an analogous situation, *In re Manolito L.* (2001) 90 Cal.App.4th 753 held that the burden of proof is by a preponderance of the evidence when a social services agency files a section 388 petition to terminate visits pending a selection-and-implementation hearing. This burden was found applicable even though there is a statutory presumption that parental visitation will continue at that phase of the dependency proceedings absent a finding of detriment (§ 366.21, subd. (h)). (*Manolito* at pp. 759-760.) Father attempts to distinguish *Manolito* on the grounds that there, unlike here, the minors had been placed in a prospective adoptive home, and parental rights had previously been terminated before that order was only conditionally reversed because of a violation of the notice requirements of the Indian Child Welfare Act. (*Id.* at pp. 756-757.) But at this stage of the proceedings, whether adoption or long-term foster care has been selected as appropriate for the minors, the parents' interest in the boys' care, custody, and companionship is no longer "paramount," and the focus has shifted to their need for permanency and stability. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

Undoubtedly, the parents have an interest in these proceedings until and unless their parental rights are terminated. (*In re J.F.* (2011) 196 Cal.App.4th 321, 335-336 [parent of child in long-term foster care has right to participate in post-permanency review hearing under § 366.3].) But it does not follow that a juvenile court must find that continued visits are detrimental under a heightened burden of proof at this late stage in the proceedings. We find support for this position in California Rules of Court, rule 5.570(h)(1)(D), which specifically provides that the burden of proof at a section 388 hearing is by preponderance of the evidence, except when a party makes certain requests that were not at issue here. (Rule 5.570(h)(1)(A)-(C) [clear and convincing evidence

12

standard governs requests to remove child from home, to remove child to more restrictive level of placement, or to terminate court-ordered reunification services].)

Finally, even if we were to conclude that the juvenile court should have applied the higher burden of proof, we would find no reversible error because it in fact applied that burden. The juvenile court found that the moving parties had shown by clear and convincing evidence that the change in the July 2010 order was in the boys' best interest even though it believed the lower preponderance-of-the-evidence standard applied. We find no abuse of discretion by the juvenile court in reaching this conclusion, given the evidence presented, as discussed below.

### C. No Abuse of Discretion.

A prior court order may be changed or set aside under section 388 when supported by a "change of circumstances *or new evidence*." (§ 388, subd. (a)(1), italics added.) Mother and father focus on the former phrase and argue that there were insufficient "new circumstances" to justify a change in the July 2010 order. They rely on cases finding, in various scenarios, insufficient changed circumstances to justify a modification of an order. (E.g., *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 641-642 [participation in 12-step meetings insufficient evidence of changed circumstances to warrant a hearing on § 388 petition because father already received extensive alcoholism treatment, with no improvement]; *In re A.A.* (2012) 203 Cal.App.4th 597, 612-613 [mother's completion of services and programs while incarcerated insufficient to show changed circumstances because she was still serving federal prison sentence].) The parents argue that the boys' troubling behaviors had been occurring for years, and evidence that these behaviors continued did not constitute a change of circumstances justifying a modification of the July 2010 order, resulting in the termination of further visits.

But even if we assume that the boys' behavioral problems remained of the same type during and after the reunification period, the assumption would not be determinative. A change in a court order under section 388 may be based on "*new evidence*" as well as a change in circumstances. (§ 388, subd. (a)(1), italics added.) "[T]he term 'new evidence' in section 388 means material evidence that, with due diligence, the party

13

could not have presented at the dependency proceeding at which the order, sought to be modified or set aside, was entered." (*In re H.S.* (2010) 188 Cal.App.4th 103, 105 [expert opinion based on evidence available at jurisdiction hearing did not constitute " 'new evidence' " within meaning of § 388].)  When the juvenile court authorized parental visits after terminating reunification services in July 2010, the boys had been living with their aunt for less than two months.  The court acknowledged reports that early visits with mother under the new placement arrangement had not gone well and invited the parties to update the court if there was any "*new information*" that would indicate that visitation was no longer appropriate.  (Italics added.)  By the time the section 388 hearing began in February 2012, more than a year and a half had passed, and the court heard abundant new evidence of the boys' continued negative responses to visits with both mother and father.  These responses included instances of acting out, loss of bowel control, and aggressiveness at home and in school.  Regardless whether these responses are characterized as similar to or worse than the behavior the boys exhibited before the July 2010 order, they constituted new evidence that visits were harming the boys and amply justified the court's decision to discontinue further visitation.

We recognize that many courts that have considered requests to modify orders under section 388 have done so in the context of a request from a parent (or parents) seeking additional services or increased visitation.  In considering such requests, which have the potential to disrupt an otherwise stable placement for their children, courts have stressed that any such change "must relate to the purpose of the order and be such that the modification of the prior order is appropriate.  [Citations.]  In other words, the problem that initially brought the child within the dependency system must be removed or ameliorated.  [Citations.]  The change in circumstances *or new evidence* must be of such significant nature that it requires a setting aside or modification of the challenged order." (*In re A.A.*, *supra*, 203 Cal.App.4th at p. 612, italics added.)  Here, it was the boys and the Agency seeking a change in court order, but the focus of the juvenile court was the same:  to promote the minors' best interests.  Viewed in this context, the new evidence of the boys' negative responses to continued parental visits was of such significance that it

14

justified terminating further visits in order to support stability in the boys' lives. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

Father claims that the consultant's opinion that visits should be halted was based on "stale" information and that the boys' negative behaviors could be explained by other factors. But where two or more inferences can reasonably be deduced from the facts, we have no authority to substitute our decision for that of the juvenile court. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 319.)

A party moving to change a court order under section 388 cannot simply rely on "new evidence," which may often arise merely with the passage of time. The moving party must also show that the change in the court order will be in the best interest of the minor. (§ 388, subd. (b); *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) Here, we have no hesitancy in concluding that the juvenile court did not abuse its discretion in finding that it was in the boys' best interests to terminate further parental visits by modifying the July 2010 order (§ 388, subd. (b)). The evidence showed that parental visits led to negative reactions in all three boys. The juvenile court did not abuse its discretion in concluding that the visits were "extremely detrimental and it's in the boys' best interest to stop the visits." In arguing to the contrary, the parents claim that there was insufficient evidence that the three boys' negative behavior could be linked to parental visits, and they point to evidence that the boys sometimes had positive experiences during visits and expressed love for their parents. Although we recognize that the visits included some positive interaction between the boys and the parents, we cannot say, in light of all the evidence, that the juvenile court's order terminating further visits exceeded the bounds of reason. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318.)

D.    *No Remand Required.*

Father argues that remand is required so that the juvenile court may provide "workable guidance [regarding] how visits could be restored." Not only do we find that father likely waived this argument by failing to ask the juvenile court for such guidance below, but we also find the argument unpersuasive on its merits.

15

In making this argument, father again relies on cases that address visitation orders during the reunification period, when juvenile courts must safeguard visitation because the focus of the proceedings is to promote reunification of the children with their parents. (E.g., *In re S.H.* (2003) 111 Cal.App.4th 310, 316-318 [court may not delegate to third party decision whether any visitation will occur during reunification period]; *In re Alvin R.* (2003) 108 Cal.App.4th 962, 972-973 [reasonable services were not provided where social services agency did not do enough to ensure visitation]; *In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1477-1478 [court may not grant therapist sole discretion to determine whether visitation will occur].)  But in this case reunification had ended, and the focus was on promoting the boys' long-term well-being and stability.  At this point in the proceedings, the juvenile court was under no duty to explain to father when visits might one day resume.

Contrary to father's argument, the juvenile court did not "adopt[]" the consultant's wishes as guidance for when visits might start again. The consultant testified that she would like for the boys to be able to "decide at some age, when the pre-frontal cortex is well developed, and they can plan for themselves, they can decide how and when to reconnect with their biological parents."  There is no indication in the record that this testimony was adopted by the court as part of its order.  And even if it had been, the comments would not require the court to provide guidance to father on when visits might resume.  The parents are free to file a section 388 petition requesting visits be resumed should either of them become aware of changed circumstances or new evidence showing that such a resumption would be in the boys' best interest.

### III.
#### DISPOSITION

The juvenile court's order terminating visitation is affirmed.

16

_____
Humes, J.

We concur:


_____
Reardon, Acting P.J.


_____
Rivera, J.


*In re D.B.* (A135254)

17

Trial Court:               San Francisco County Superior Court

Trial Judge:               Honorable Charlotte Woolard

Counsel for Appellant, A.G.:   Konrad S. Lee, under appointment by the First District Appellate Project

Counsel for Appellant, S.B.    Judith Ganz, under appointment by the First District Appellate Project

Counsel for Respondent     Dennis J. Herrera, City Attorney, Kimiko Burton, Lead Attorney; Gordon-Creed, Kelley, Holl & Sugarman, LLP, Jeremy Sugarman, Anne H. Nguyen