Filed 8/7/15  In re S.J. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.J. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E062074 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ1100162) |
| v. | O P I N I O N |
| D.B. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Lawrence P. Best, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Law Offices of Vincent W. Davis & Associates and Stephanie M. Davis for Defendants and Appellants.

Gregory P. Priamos, County Counsel, and James E. Brown, Guy B. Pittman, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

## I. INTRODUCTION

Defendants and appellants, de facto parents D.B. and G.B., appeal from the juvenile court's denial of their petition under Welfare and Institutions Code section 388 seeking reversal of the juvenile court's order removing minors S.J. (born in April 2009), K.M. (born in June 2010), and C.J. (born in May 2011) from their home. The B.'s contend the juvenile court abused its discretion in denying their petition because it did not fully understand and consider the testimony of their therapist and failed to consider the relationship between them and the children. We find no error, and we affirm.

## II. FACTS AND PROCEDURAL BACKGROUND

The three children became dependents of the court in 2011, after plaintiff and respondent, Riverside County Department of Public Social Services (DPSS), filed a petition alleging their biological mother neglected their health and safety and failed to provide necessary medical care. The children were placed in foster care in the home of the B.'s. Reunification was unsuccessful, the mother's parental rights were terminated in January 2013, and a permanent plan of adoption was ordered. The B.'s were designated as prospective adoptive parents.

In November 2013, allegations of physical abuse and general neglect had been made against the B.'s. It was alleged that D.B. had given the children "whoopings" to discipline them and that he used a "pancake flipper" to hit them. The B.'s denied that they hit the children. The allegations of physical abuse were determined to be unfounded

2

and the allegation of general neglect was found to be inconclusive as to inappropriate discipline.

The B.'s were granted de facto parent status in January 2014.

In April 2014, K.M. was suspended from his Head Start school because of his behavior. A referral was submitted for therapy for K.M. The foster family agency social worker informed DPSS that K.M. had seen the therapist before, and he had informed her that "there was nothing wrong with [K.M.] and it was a parenting issue."

In a meeting with the social worker on April 17, 2014, G.B. told the social worker that K.M. continued to act out, and she was unwilling to move forward with the adoption. She had failed to provide a certificate of completion of parenting class, and the home study was not complete. G.B. stated she was not happy that K.M. had been referred to the therapist who had previously stated he did not need therapy, and she asked that he be assigned to another counselor. G.B. stated that K.M. was disrespectful and defiant at home. G.B. stated "she 'wants money' because it's going to cost a lot [*sic*] to raise him . . . ." In a later telephone call, G.B. told the social worker that DPSS was "not doing anything to help with [K.M.]"

Later that month, K.M., then age three, climbed over or through a fence into a pool and nearly drowned. He was taken to the hospital, but he suffered no injuries, and his condition was not life threatening. G.B. provided varying accounts of the incident. She said K.M. had been playing alone in the backyard while she was on the telephone; she

3

said she had thought he was inside when the incident occurred; and she said she was cooking and paying bills when the incident occurred.

Because of concerns over the children's supervision, they were transported to a new foster home. En route, they disclosed that D.B. and G.B. had used corporal punishment on them. K.M. used profanity, which he claimed to have learned from D.B. C.J. and K.M. disclosed that the B.'s "whooped" them, but S.J. denied being whooped. In the new foster home, K.M. scratched the new foster father, cursed, urinated on himself, smeared feces on the bathroom walls, threw and broke things, slapped and hit his siblings, and pushed another child down the stairs. The new foster family requested his removal from their home.

S.J. had a mild expressive language delay and was receiving speech therapy. Her behavior was age appropriate, and she was healthy. K.M. was assessed at the Riverside County Mental Health 0-5 program in May 2014, and he was diagnosed with an adjustment disorder. He was extremely aggressive, and the therapist indicated he was suffering from trauma. He was placed in a Multidimensional Treatment Foster Care home. C.J. did not have any developmental delays. In a previous foster home, he mimicked K.M.'s behaviors, including using foul language. He had adapted to his current foster placement.

Following its investigation, DPSS concluded: "Based upon information gathered during the investigation process, it is believed that [K.M.] managed to climb the fence surrounding the backyard pool on his own, and jump into the pool. [G.B.] responded

4

appropriately to the incident, (removed [K.M.] from the pool and ensured he received immediate medical attention), and medical staff concluded that [K.M.] suffered no medical ailments as a result of the incident. However, the aforementioned issues pertaining to supervision and discipline are very concerning. It is also concerning that the children have lived in the [B.'s] home since infancy and exhibit such behavioral issues at their young ages. As a result, this investigation will be closed as Substantiated for General Neglect."

At a hearing in July 2014, the juvenile court determined that removal of the children from the B.'s home was appropriate.

In July 2014, the B.'s filed a petition under Welfare and Institutions Code section 388 alleging a change in circumstances that would justify changing the May 2014 order. The B.'s alleged they had completed a parenting class, had made improvements to make the pool area safer, and had taken a course dealing with children with special needs. They alleged the proposed change was in the children's best interest because the children were bonded to them and would benefit from being parented by them. They attached certificates showing that both D.B. and G.B. had completed 12 sessions of a parenting skills course between January and March 2014; a notice of a site visit by a child care licensing office representative on June 26, 2014, stating that no regulatory violations had been observed; notices that the pool fencing improvements complied with code requirements; and a certificate showing that G.B. had completed training on dealing with special needs children in January 2014.

A hearing was held on the petition in September 2014. The B.'s presented testimony from their therapist, Wanda Cooper, a trained marriage and family counselor who had completed doctoral studies in clinical psychology. Starting in August 2014, the B.'s had attended four or five classes that Dr. Cooper had taught on subjects such as foster parenting and child traumas. The B.'s sought couples therapy from Dr. Cooper because of the removal of the children from their home, which they said had been because of their neglect and lack of supervision. They accepted responsibility and expressed remorse for the incident. During the therapy, the B.'s established the goals of putting a safety plan in place for the children, enhancing their parenting skills, improving their communication about issues concerning the children, and anger management. The B.'s had been in therapy with Dr. Cooper for three weeks. Dr. Cooper stated her opinion that the B.'s could provide a safe home for the children; her opinion was based on their honesty about the incident and their seeking out training to improve their parenting skills which expressed their love of and commitment to the children. She stated that her therapy with the B.'s was "[v]ery early in the process." Dr. Cooper had not read the social worker's reports, and she had never met the children. She was aware that an allegation of corporal punishment had been made, and the B.'s had denied using corporal punishment; however, she never asked them if they had hit or spanked the children.

G.B. testified that she had been in therapy with a different counselor before Dr. Cooper, but had discontinued because it was not a good fit. G.B. said she had taken about 16 parenting classes, and she now understood that K.M. showed traits of fetal

6

alcohol syndrome. The classes and her therapy had given her insight into how to deal with his behavior and that of the other children. She described the added safety measures in the home, including extra locks out of the children's reach and an alarm that sounded when the door to the backyard was opened. She said she had been preparing lunch when K.M. had gotten into the pool. D.B. testified that a brick wall that had partially blocked the view of the pool had been removed and he had added the back door alarm. He stated that therapy with Dr. Cooper had been beneficial and had improved his parenting.

The juvenile court commended the B.'s for taking classes, but pointed out that they had been in therapy with Dr. Cooper for only three weeks and were very early in the process. Although the B.'s had denied using corporal punishment, Dr. Cooper talked about their use of corporal punishment. The court concluded: "Based on the standard, I do not believe there are changed circumstances, and I do not believe it is in the children's best interest." The court therefore denied the petition.

## III. DISCUSSION

To succeed on a petition under Welfare and Institutions Code section 388 to change a previous court order, the petitioner must prove by a preponderance of the evidence both (1) a change in circumstances or new evidence and (2) that the requested change is in the child's best interest. (Welf. & Inst. Code, § 388; *In re Daijah T.* (2000) 83 Cal.App.4th 666, 672; *In re D.B.* (2013) 217 Cal.App.4th 1080, 1089.) We review the juvenile court's ruling on the petition under an abuse of discretion standard. (*In re Hector A.* (2005) 125 Cal.App.4th 783, 798.)

7

The children were removed from the B.'s home because of a lack of supervision that culminated in K.M.'s near drowning. The evidence also indicated the B.'s had used corporal punishment on the children, and K.M. had behavioral issues while in the B.'s care and after being removed. The B.'s had already completed the parenting classes *before* the May 2014 hearing at which the children had been removed from their home, and G.B. had also completed the special needs training class before that date. Thus, completion of the classes did not constitute a change in circumstances. Moreover, while the B.'s established that they had made improvements to the safety of their home, those physical improvements did not address the concerns about lack of supervision. Although the B.'s had attended three counseling sessions with Dr. Cooper, the juvenile court found Dr. Cooper's testimony inconsistent: she reported that they were very early in the process of therapy, yet she felt comfortable that the children could be safely returned.

The B.'s argue that the juvenile court did not understand or fully consider Dr. Cooper's testimony because the juvenile court seemed to indicate that it believed "time alone was the sole indicator of progress in counseling." However, Dr. Cooper explicitly stated that the B.'s were very early in the process of therapy, having completed only three weekly sessions. Moreover, Dr. Cooper's information about the children was all derived from what the B.'s told her; she had never met the children and had never read the social worker's reports. Although she was aware of an allegation of corporal punishment, she never asked the B.'s if they hit or spanked the children.

8

We find no abuse of discretion in the juvenile court's assessment of the credibility of the testimony presented at the hearing.

The B.'s also contend the juvenile court "failed to consider the extensive relationship" between them and the children and failed to articulate any factors considered in concluding that the requested change was not in the children's best interest. However, the trial court had already determined that the B.'s had not shown a change in circumstances. The B.'s had the burden of proving *both* prongs of the test to justify a change in a prior order. (*In re D.B.*, *supra*, 217 Cal.App.4th at p. 1089.)

## IV. DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____
J.

We concur:

McKINSTER _____
Acting P. J.

MILLER _____
J.

9