Filed 8/11/15  In re K.B. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re K.B. et al., Persons Coming Under the Juvenile Court Law. | C077904 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>B.B.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JD229535, JD229936, JD233798) |

B.B. (mother) appeals from the juvenile court's order granting a petition by the agency, Sacramento County Department of Health and Human Services, to modify a prior visitation order.  (Welf. & Inst. Code, § 388; unless otherwise stated, statutory

1

references that follow are to the Welfare and Institutions Code.) Mother argues the agency failed to show sufficient grounds for modifying the existing visitation order, and the court's order impermissibly delegates whether visitation is to occur to the agency. We affirm the juvenile court's order.

FACTS AND PROCEEDINGS

In light of the sole contention raised on appeal, we need not recite the history of the case in detail.

The minors (nine-year-old K.B., nine-year-old J.B., six-year-old C.B., five-year-old L.B., Jr., four-year-old P.B., and six-month-old A.B.) were detained in September 2013, based on allegations of excessive corporal punishment by L.B. (father) and domestic violence between the parents. At the contested jurisdiction/disposition hearing in January 2014, the juvenile court sustained the amended section 300 petitions, placed the minors in foster care, and ordered reunification services and visitation for the parents. The visitation order specified regular visitation consistent with the children's best interests and authorized the agency to determine the time, place, and manner of visitation.

In June 2014, the six-month review report recommended termination of the parents' services and a plan of adoption for the minors, who were placed in two different homes (one for the three girls, K.B., P.B., and A.B., and another for the three boys, J.B., C.B., and L.B., Jr.). The parents had twice-weekly supervised visits, but had to attend them separately due to previous court orders; mother visited for the first hour and father visited for the second hour, with all minors present during both hours.

At the permanency hearing in July 2014, the juvenile court continued the parents' services as to the boys, but terminated services and set a section 366.26 hearing as to the girls. The court maintained the visitation order unchanged "without prejudice."

In September 2014, the agency filed a section 388 petition requesting that the juvenile court reduce visitation from five hours of supervised visitation per week to

2

visitation "at the discretion of the Department in the best interests of the children." The agency alleged changed circumstances as follows: "The five hours per week, including an hour for the mother to bond to [A.B.], is inappropriate, as reunification services have been terminated. The visitation is disruptive and at times inappropriate including the father giving his phone number to [J.B.] . . . and bringing the dog. The visits are anxiety producing for the children and the caregivers report the children return confused, anxious and agitated. Reportedly, the visits negatively impact the mood of the children for several days." The agency claimed the changed order would be in the children's best interests because "[t]he three girls have all moved to homes desiring to provide permanence through adoption. The girls need to begin transferring their emotional connections to the new caregivers without pressure from the birth parents."

The juvenile court held a hearing on the section 388 petition on October 29, 2014. Social worker Cindy Clark testified for the proposed change; mother testified against it.

Clark, a 16-year veteran of the Children's Protective Service Adoptions Bureau with degrees in child development and psychology and "extensive training in the areas of attachment and bonding," related to her own experiences as a foster parent and an adoptive parent, testified that given the girls' move toward adoption and the way visits had recently gone, five total hours of visitation per week (one hour per parent twice a week, plus an additional hour for mother alone to bond with the youngest child) was "excessive and potentially detrimental." Clark based this opinion on having personally observed two visits and read accounts of many more, as well as on what was reported to her about them.

It was reported to Clark that the minors did not always all get the same amount of attention during visits; some of them were ignored; sometimes they were not redirected when their conduct was inappropriate; and sometimes the parents told the minors "things which are counter productive." For instance, it was reported that the parents had told K.B. she need not go to summer school, even though she was two years behind

3

academically and had already missed so much school that a truant officer had visited her new foster home to talk to her. It was also reported that K.B. was promised that if she told the judge what the judge needed to hear and she got to go home, she would get an iPad.

The minors were at the time in four different foster homes. All the foster parents had told Clark that the minors took one to two days to acclimate after a visit; both girls and boys became more aggressive, defiant, and confrontational after visits.

In Clark's opinion, it would be in the girls' best interest to change the visitation order because the minors needed to transfer their emotional connections from the birth parents to the foster parents, and because the minors suffered emotionally from the disparity in attention they got during visits. Clark had repeatedly observed children soliciting a parent's attention and being ignored because the parent was paying attention to another child. Skilled parents would be able to handle visits with multiple children without ignoring any of them, and would intervene promptly to correct any inappropriate behavior by a child, rather than leaving it to an agency worker to step in to provide attention or correction.

Mother testified that reducing her visits would not be good because the minors wanted to see her, "[b]ecause I'm mom." She admitted that some visits had "problems" and were "terrible," depending on what mood the minors were in. She tried to give all the minors the same attention, but the baby (A.B.) needed special attention because she could "get[] into stuff" if not watched closely. At the end of visits, the minors were sometimes happy and sometimes sad. Mother had never told K.B. she did not need to go to school.

Before hearing argument, the juvenile court asked the agency's counsel what "a general visitation order" would look like with six children. Counsel suggested "twice a month, one hour per parent," and the children could be "split up."

Following argument, the court made these remarks:

4

"The only three children before the Court today are the girls in terms of visitation. From the Court's perspective, I think the Department has shown there's a change in circumstances. Some of the changes are that the boys [*sic*] are not in reunification any longer. The girls are now in homes willing to take permanency. [K.B.] is in a home that she prefers to be in. So I think there is a change in circumstances. In the Court's perspective, it is in the best interest to make some changes. Clearly, from the Court's perspective the visits have some struggles. It seems very complicated to me for the children the way it's set out now. From the Court's perspective, though, having said that, I think it is in the best interest of the children to change the schedule, and there is a change in circumstances. The Court wants to make sure that the visits go well for children and parents at this stage.

"And from the Court's perspective, I'm going to do as follows: I'm going to give the Department some discretion, then I want to hear back when we come in tomorrow what the visitation plan is going to be. Because my concern is that -- I'm going to be straight up -- I don't think that one hour a week with -- one hour a month with six kids, I think is not going to make for a good visit for anybody. I think . . . the parents are struggling with how to parent six children at one time. I think it's fair to say that they're not able to do that. So in my mind, we shouldn't have all six children at the visit at the same time, because that's not good for the kids. And I don't think it's good for the parents.

"So the Department needs to either allow the parents to visit together -- if there's any domestic violence or issues, the visits stop. I'm not ordering that. I'm going to give the Department discretion. But I want to know what the plan is going to be so that we're sure the visits are going to be appropriate. I think the way it is now is too much. I think it's not allowing the children -- I think it's too disruptive to be Tuesday, Thursday. I think it's very disruptive to the children's schedule, their school, their emotional well-being. I think all those things are true.

5

"So I'm looking at something that, I think, would be reasonable, some kind of visitation, say, twice a month I think is reasonable. How many hours it's done -- but I think twice a month with six kids one hour a week is not going to be fun for anybody because you have such a disparate range of ages. . . . I think the social worker's absolutely right. A skilled parent probably could handle six kids and know how to do that. These folks have some parenting deficits. That's why they're here. I don't think they are able to multi task that way. So I think we need to structure the visits so that they are positive for the child, first and foremost. And it doesn't sound like six children at once is a positive experience.

"So what I would like to hear for the girls is -- when we come back tomorrow for the .26 hearing -- what the plan is for the girls' visits? I'm going to grant the motion. But I want to hear what the plan is for what the visit's going to look like. Is it going to be twice a month for two hours? Is it twice a month, one hour, all six kids there? Three kids, three kids? I'd just like to know what the plan is going to be so that we can ensure that it's positive for the children. I think six children given the parent's [*sic*] deficits is too much. I just don't think that's going to be fun for anyone, particularly the children. So I would like to hear what the plan's going to be for the girls when we come back tomorrow.

"The Court is finding a change in circumstances and best interests. I am indicating it would be a general visitation order within the perimeters I've indicated. I want to hear what the plan is when we come back tomorrow. And I will order the parents to both be present tomorrow. There's been discussion. I do value Ms. Clark's expertise, so I'm counting on some articulation on what she thinks is going to be a good plan for the children to make it positive. Because I want it to be positive for everyone, most importantly the children. And we'll see where we are tomorrow.

"So the motion is granted subject to the Court approving what the plan's going to be for the girls."

6

The minute order of the hearing summarized the juvenile court's remarks as follows: "The Court finds there is a change of circumstance and it is in the best interest of the children to vacate the prior court order and allow the Department of Health and Human Services to have discretion for visitation; however, the Court does authorize the parents to visit together. [¶] The Court would like the Department to consider a visitation plan for the parents a minimum of two times per month if possible."

At the hearing on October 30, 2014, despite the juvenile court's statement the day before, the court and the parties did not discuss visitation on the record.

On November 7, 2014, mother's trial counsel filed notice of appeal from "[o]rders made on October 29, 2014, where the court granted the Department's 388 motion filed on September 16, 2014."

On November 13, 2014, the juvenile court issued an "order after hearing" on the agency's section 388 petition. This order stated that the petition was granted, then repeated the language of the October 29 minute order verbatim.

DISCUSSION

I

*The Appeal Is Not Moot*

After mother filed her opening brief, the agency filed a motion to dismiss the appeal as moot, with a request for judicial notice that on January 9, 2015, the juvenile court terminated mother's parental rights as to the three minors who are the subject of this appeal. Mother responded that she has separately appealed from the order terminating her parental rights and that appeal is pending in this court. (In re A.B. et al. (C078211, app. pending).)

We granted the agency's request for judicial notice, but denied its motion to dismiss the case.

The agency renews its mootness claim in its brief, asserting that if mother succeeds in reversing the termination of her parental rights, the juvenile court on remand will have to make a new visitation order that will replace the order challenged in this appeal. Mother replies: (1) she relied unsuccessfully on the beneficial parental relationship exception to adoption in the section 366.26 proceedings; (2) the juvenile court's erroneous visitation order may have deprived her of the frequent and regular visits needed to establish that exception to adoption; (3) thus, the challenged visitation order potentially "infect[ed] the outcome of the section 366.26 proceedings"; (4) therefore, a reversal in this appeal could affect the outcome on remand from a reversal of the order terminating parental rights. We conclude, for the reasons given by mother, this appeal is not moot.

## II

### *The Juvenile Court Did Not Abuse Its Discretion By Finding That a Change in the Visitation Order Was in the Children's Best Interests*

Turning to the merits, mother contends first that the agency failed to meet its burden to show a change in the visitation order was in the children's best interest "when they shared a bond with their mother and the issue was one of logistics which could be remedied without resorting to orders which threatened visits altogether." (Capitalization omitted.)

As mother acknowledges, we review the juvenile court's ruling on a section 388 petition for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re D.B.* (2013) 217 Cal.App.4th 1080, 1089 (*D.B.*).) "Thus, we may not reverse unless the juvenile court exceeded the bounds of reason, and we have no authority to substitute our decision for that of the lower court where two or more inferences can reasonably be deduced from the facts." (*D.B.* at p. 1089, citing *Stephanie M.* at pp. 318-319.) Therefore, although the agency had the burden below to establish by a preponderance of

8

the evidence that the changed order it sought was in the children's best interest (*D.B.* at p. 1089), we do not redecide whether the agency met its burden. We decide only whether the juvenile court abused its discretion and "exceeded the bounds of reason" (*ibid.*) by finding that a changed order would be in the children's best interest. We conclude the court did not do so.

As social worker Clark testified and the juvenile court found, visitation under the existing order was problematic because the parents, whose parenting skills were limited, could not relate to the minors during visits in ways that did not cause unhappiness for the minors both during and after the visits. As Clark also testified and the court also found, the fact that the girls were moving toward adoption militated toward a reduction in visitation, so as to minimize the possibility of a conflict in loyalties between the biological parents and future adoptive parents. Contrary to mother's assertion, the "issue" was not merely "one of logistics." Under all the circumstances, the court's conclusion that a changed order would be in the children's best interests did not exceed the bounds of reason.

So far as mother asserts that a changed order "threatened visits altogether," we address and reject that assertion below.

III

*The Juvenile Court's Order Did Not Impermissibly Delegate*
*Complete Discretion to the Department as to Whether Visits Should Occur*

Mother contends that the juvenile court's order was so "ambiguous, confusing, and contradictory as to [mother]'s continued right to visit," that it failed to protect that right, instead giving the agency complete discretion to decide whether mother would be allowed to visit at all. We agree that if the order had had that effect, it would have been an improper delegation of authority to the agency. (*In re M.R.* (2005) 132 Cal.App.4th 269, 274; *In re S.H.* (2003) 111 Cal.App.4th 310, 319.) But it did not have that effect.

9

The juvenile court may properly grant the agency discretion to define the time, place, and manner of visits. (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374-1376 (*Moriah T.*); accord, *In re T.H.* (2010) 190 Cal.App.4th 1119, 1123.) The order in this case is not a model of clarity. However, both on its face and in conjunction with the court's extensive remarks at the section 388 hearing, it falls within the *Moriah T.* rule.

The order after hearing, repeating the language of the minute order that purported to summarize the juvenile court's oral findings and conclusions, authorizes joint visits by the parents and urges the agency to create a plan that allows at least two such visits per month. On its face, this language does not permit the agency to deny visits altogether, because that would flout the court's express authorization of joint visits.

Moreover, the juvenile court's remarks at the section 388 hearing make clear that the court intended a "general visitation order" that would provide "reasonable" visitation, and had clear guidelines for reasonable visitation in mind -- "twice a month," with the specific details to be worked out by the agency. This language (erroneously paraphrased in the minute order and the order after hearing as a mere request by the court that the agency "consider" twice-a-month visits) cannot be read as a grant of discretion to the agency to deny visitation. On the contrary, it is precisely the delegation of "time, place and manner" details of visitation authorized by *Moriah T.*

If mother thought the order after hearing was insufficiently clear and detailed to protect her right to visitation, it was her obligation to call this point to the juvenile court's attention when the court issued the order. Her failure to do so forfeited any claim on appeal that the order was not sufficiently clear or detailed. (See *People v. Braxton* (2004) 34 Cal.4th 798, 813-814.)

10

DISPOSITION

The visitation order (judgment) is affirmed.

     HULL     , J.

We concur:

     RAYE     , P. J.

     BUTZ     , J.