Filed 7/17/14  In re C.C. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re C.C. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH & HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>M.C.,<br><br>        Defendant and Appellant. | D064921<br><br>(Super. Ct. Nos. J516861C,<br>                    J516861D) |


APPEAL from orders of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Neal Gold, under appointment by the Court of Appeal, for the Minors.

M.C. (mother) appeals from orders denying the petitions of San Diego County Health and Human Services Agency (Agency) under Welfare and Institutions Code[1] section 388, in which Agency asked the court to place minor children C.C. and K.C. with their maternal grandparents. In denying the petitions, the juvenile court concluded that Agency had not shown changed circumstances by a preponderance of the evidence. M.C. contends the court's rulings were an abuse of discretion, as the evidence showed the children's maternal grandparents were able to provide an appropriate and safe place for them. Agency points out that while it had originally sought placement with the maternal grandparents, there was significant evidence against such placement, and it cannot say the juvenile court's decision was arbitrary, capricious or otherwise an abuse of discretion.

We agree with Agency and conclude that on this record, the juvenile court had reasonable concerns about the maternal grandparents' ability to be truthful and sufficiently protect the children from the parents, and thus the court did not abuse its discretion in denying Agency's section 388 petitions for modification on grounds Agency had not met its burden to show changed circumstances. Accordingly, we affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

*Agency's Section 300 Petition for C.C.*

In August 2011, Agency filed a section 300 petition on behalf of then one-month-old C.C., alleging his parents exposed him to violent confrontations in the family home,

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

including one in which mother punched and slapped C.C.'s father, B.C. (father) and brandished a knife at him, and another in which father kicked and choked mother, placing C.C. at substantial risk of serious harm. Agency concurrently sought and obtained a protective custody warrant to remove C.C. from his parents' custody.

In a detention report, social worker Natalie Dinneny summarized the domestic violence incidents preceding Agency's petition as well as mother's prior child welfare and criminal history.[2] Dinneny described interviews with mother, C.C.'s siblings, and C.C.'s maternal grandmother, M.F. According to Mother, after C.C.'s birth, she and father lived in M.F.'s home. M.F. told Dinneny she was willing to care for C.C. and his siblings during Agency's involvement. M.F. reported to Dinneny that she did not approve of mother and father's relationship, and that she was only letting him live in her home while he was on Naval leave from Spain to permit him to see C.C. and because mother told her they would not argue. M.F. told Dinneny that father would not be welcome into her home. Dinneny reported that on August 19, 2011, mother had absconded with C.C. and, though mother had contacted Agency, refused to meet with its representatives because she believed Agency intended to have her arrested.[3]

---

[2] Agency also petitioned on behalf of C.C.'s older siblings and recommended they be placed with father P.H. Those children were ultimately placed with P.H. and Agency terminated jurisdiction over them.

[3] In her report, Dinneny described a telephone call she had with mother on August 22, 2011, after leaving mother a message to contact her. During that call, mother called Dinneny a " 'lying bitch' " regarding mother's belief that Dinneny had stated Agency would not take her daughters into custody. Mother told Dinneny, " 'Do you know what this process taught me? To take my ass beatings like a woman and not call the police

*Mother's Concealment of C.C. and C.C.'s Detention Hearing*

Mother did not appear for the detention hearing, after which the court found Agency made a prima facie showing C.C. was described by section 300, ordered the protective custody warrant to remain outstanding, and issued a detention order for him. The juvenile court issued a bench warrant for mother.

As of mid-September 2011, Mother remained absent despite numerous efforts by social worker Vincent Nguyen to contact her. Father's whereabouts were likewise unknown, and he was absent without leave from the Navy. Nguyen interviewed M.F. on September 9, 2011, who informed him she had never witnessed any arguments or physical violence between mother and father, but expressed concern that mother was possibly still in contact with father, making M.F. concerned for mother and C.C.'s physical safety. M.F. denied any contact with mother or father except for a text message from mother telling her that she and C.C. were fine. M.F. was responsible for mother's cell phone account but she had not seen recent activity on it; she believed mother may have turned off the phone and discarded it. Nguyen reported that Agency had great concerns about the health and safety of C.C. and his siblings if they were to return to mother or father's care due to their violent physical altercation, mother's use of C.C.'s siblings to call police in connection with a domestic violence episode, and the fact mother had suggested to Agency that she would not report future domestic violence incidents.

---

because they are just going to take my kids.' " Mother told Dinneny to leave her alone, and hung up on her.

The juvenile court ordered Agency to continue its search for mother, and set a jurisdiction and disposition hearing for October 2011.

In October 2011, Nguyen reported that father had returned to his Navy post in Spain and that Navy personnel believed that mother and C.C. were with him. The juvenile court granted a continuance to January 2012.

In January 2012, Nguyen reported that a Navy investigator had confirmed to Agency that mother and C.C. were indeed in Spain with father but had returned to San Diego in November 2011, and were allegedly residing with M.F. Nguyen sent police to M.F.'s home on several occasions. On the first day no one answered the door. Two days later, M.F. answered but denied mother and C.C. were living there, and denied the officers entry into her home. On January 31, 2012, mother contacted Nguyen by telephone and confirmed she had C.C. with her, but declined to tell Nguyen where she was or whether she had been to Spain. Mother stated she would turn herself in only if Agency placed C.C. with M.F.

With the assistance of law enforcement and the District Attorney's child abduction unit, Agency took custody of C.C. at the end of April 2012, when mother and father took C.C. for a doctor's appointment in Chula Vista. C.C. was detained in a licensed foster home.

*C.C.'s Jurisdiction and Dispositional Hearing*

In May 2012, the juvenile court conducted a jurisdiction and disposition hearing in which it set the matter for a contested adjudication and disposition hearing. In his report for the May 2012 hearing, social worker Nguyen summarized his May 3, 2012 interview

5

with M.F., who stated she wanted to have placement of C.C. but knew there were concerns. Nguyen confronted M.F. about Agency's belief she knew of mother and C.C.'s whereabouts but had not alerted Agency or law enforcement. M.F. responded, "I'm not going to call the cops on my grandson," and that she did not believe C.C. should be in the care of either parent but she wanted guardianship. M.F. continued to deny ever seeing mother and father argue or fight, but Nguyen told her C.C.'s siblings had reported M.F. was present during the fighting. M.F. denied being present and stated her grandchildren were mistaken.

Nguyen also confronted M.F. with photographic evidence that C.C. had been in her home in mid-March 2012. When initially shown the photograph, M.F. claimed it had been taken three weeks earlier, but when Nguyen pointed out its date, M.F. became agitated and denied the evidence. Nguyen told M.F. that due to Agency's concerns and the fact she was not forthcoming, she would not be a primary placement option for C.C.

Nguyen obtained statements from father and mother, who was pregnant. Mother stated she wanted C.C. placed with M.F. or alternatively non-relative extended family member (NREFM) C.M.

*C.C.'s Contested Jurisdiction and Dispositional Hearing*

The contested jurisdiction/disposition hearing for C.C. took place in July 2012, at which time the juvenile court made a true finding on the petition and ordered supervised visitation for mother and father. C.C. was placed with NREFMs C.M. and M.B. By that time, mother had given birth to a daughter, K.C.. Mother tested positive for marijuana at the time of the child's birth. In connection with that hearing, Nguyen interviewed M.F.'s

6

husband, maternal step-grandfather D.F.,[4] who reported being shocked about mother's marijuana use during her pregnancy. D.F. claimed he had not seen mother making poor decisions since her return to California, that he and M.F. had discussed mother's decisions with her, and he had not observed mother interacting with father in recent weeks.

*K.C.'s Section 300 Petition*

Agency filed a petition under section 300 on K.C.'s behalf, and held her detention hearing on the same day as C.C.'s contested jurisdiction/disposition hearing. The juvenile court detained K.C. with NREFMs C.M. and M.B. The court also issued a one-year restraining order between father and mother.

In July 2012, mother and father were again engaged in a domestic violence incident after which father was arrested. Father attempted to choke himself with a seatbelt while being transported to jail. That month, the juvenile court made a true finding on K.C.'s petition, placed her with NREFM C.M. and M.B., and ordered separate supervised visits for the children with mother and father.

*Review and 12-Month Permanency Planning Hearings*

C.C.'s combined six- and twelve-month review hearing was held in October 2012. Social worker Nguyen reported that both C.C. and K.C. thrived in their NFEFM placement, and the caregivers were able to attend to all of their developmental needs. He also reported that though mother had been living with M.F. while she engaged in

---

4    We refer to M.F. and D.F. together as the maternal grandparents.

reunification, their relationship had deteriorated, resulting in mother moving out to live with a friend. Though Agency initially recommended the matter be set for a section 366.26 hearing, in a January 2013 addendum, it eventually recommended, and the juvenile court ordered, additional services to the 18-month period for both parents. At about the same time, the court held K.C.'s six-month review hearing and ordered additional services for mother and father for K.C.

The matter proceeded to joint 12-month permanency planning hearings in July 2013 for C.C. and K.C., then almost ages two and one respectively. In connection with that hearing, social worker Nguyen reported that mother appeared to be trying to conceal another pregnancy and a few months later the parents had been found together in father's car. Mother had denied to her therapist that father was the child's father. She claimed to Nguyen that her contact with father was a "one time" thing. The parents requested a trial, and the court set the matter for a pretrial status conference and contested 12-month review hearings.

*Agency's Decision to Recommend Placement with Maternal Grandparents*

In August 2013, Agency reported that father disclosed he had engaged in a sexual relationship with C.C.'s and K.C.'s NREFM caregiver C.M.. The juvenile court terminated the parents' reunification services and set the matter for a section 366.26 hearing, as well as a special hearing regarding the children's placement. At the special hearing, the juvenile court ordered C.C. and K.C. removed from C.M., but that they remain placed with NREFM caregiver M.B.

8

A month later, Nguyen reported that NREFM caregiver M.B. had decided it was not beneficial for the children to remain with him. Though Nguyen recognized that M.F. had not been fully cooperative with Agency in the early phases of the case, he recommended that the children be placed with the maternal grandparents. He reported that Agency had received information to suggest M.F. could be an appropriate placement for the children under very specific parameters; that the maternal grandparents demonstrated an ability to set limits and boundaries when they would not permit mother to have an unauthorized visit with C.C.'s half-siblings without P.H.'s permission. According to Nguyen, during a team decision making meeting with him, a court appointed special advocate (CASA), mother and Agency, the grandparents took responsibility for their actions and inactions, started to develop strategies to maintain appropriate boundaries, recognized the loss of their relationship with mother and potentially K.C. if mother did not abide by strict limits, and felt they could keep their distance from mother with proper coaching and training.[5] Agency explained to the grandparents that any violation of court orders or Agency recommendations would likely result in the children's immediate removal from their care. With specified conditions,

---

[5] Nguyen reported that agency, the CASA, and the family felt the placement would be appropriate under conditions that (1) the maternal grandparents have a positive home evaluation; (2) there be regular Agency oversight including in person visits for parents in the child welfare service office; (3) the grandparents participate in "Pride" classes as well as support groups for foster and adoptive parents; (4) the grandparents follow all court orders and Agency recommendations; and (5) mother and father not have any unauthorized contact with the children outside of structured supervised visitation guidelines fashioned by the court and Agency.

Agency believed the grandparents could offer the children permanency without risking their safety and well-being.

The juvenile court did not authorize placement with M.F., but authorized the children's detention together in a licensed foster home. It set the matter for a contested special hearing at which the maternal grandparents were to appear. It also set the matter for a section 366.26 hearing.

At the September 2013 special hearing, Agency petitioned under section 387 that the children be placed in a licensed foster home, and the juvenile court ordered them detained in such a home. Several weeks later, Agency reported that the foster parents could not provide a concurrent home, and recommended the children be placed with maternal grandmother M.F. Minor's counsel opposed that request, but was not opposed to placement with another appropriate relative.

*Agency's Section 388 Petition and Hearing*

On October 15, 2013, Agency filed petitions under section 388 asking the juvenile court to place C.C. and K.C. with the maternal grandparents. Agency maintained the maternal grandparents had recognized their failure to act and protect C.C. when he and mother were living in their home, and they were aware of the protective issues and manipulative tendencies of the children's parents during their relationship. According to Agency, the grandparents recognized the parents could not safely care for the children, were willing to educate themselves and participate in safety planning, and were willing to sever their ties with mother to protect them. Agency stated the children were social and

10

comfortable in M.F.'s presence, and neither grandparent had criminal or child welfare history that would put the children at risk for abuse or neglect.

The matter proceeded to a hearing in which the Agency presented testimony from Nguyen and M.F. The court received into evidence the social workers' reports from August 2011, January 2012, May 2012, September 2013 and October 2013. On questioning by minor's counsel, Nguyen stated the maternal grandparents had visited with the children "almost every other month" and sometimes M.F. would "tag along" with mother's visits. He admitted M.F. had not disclosed to him that she had been in telephone contact with mother for some period of time before mother returned to San Diego, and that when he confronted M.F. with documentation showing the length of mother's and C.C.'s stay in her home, she continued to refute those facts. Nguyen also admitted that when he asked M.F. who would be unsafe to have around the children, she told him father would be unsafe but she saw no risk from mother, because M.F. felt mother had "made a lot of progress in the last year." Nguyen agreed that M.F. denied and minimized her knowledge of the parents' fighting, though C.C.'s siblings had reported she was present at the scene of one of the domestic violence incidents in 2011. Nguyen testified he recommended domestic violence training for the grandparents because at the time of the 2011 incident, M.F. reported to law enforcement that she had seen mother with a black eye months before and believed father had caused it. Nguyen admitted there were discrepancies between mother's and M.F.'s stories; M.F. had denied permitting mother to see C.C.'s half-siblings during their visits with the grandparents, but mother claimed M.F. allowed her to see them.

11

In response to the court's questions, Nguyen testified that he had not spoken with P.H. and since April 2012 had not spoken with C.C.'s siblings about their feelings toward C.C., so his statements regarding their view of C.C. was from early 2012. Nor had Nguyen recently interviewed the siblings about their visits to M.F.'s home. He had not interviewed M.F.'s neighbors. He had no understanding of how frequently mother went to the maternal grandparents' home. The court asked Nguyen what the grandparents said that caused him to believe they had understood the parents' past manipulation. He responded that they recognized manners of mother's demeanor that seemed "uncharacteristic" or "out of place," and "when they've checked up on it and asked me about certain things, I've communicated to them what my understanding of the situation was. And they felt that the information that they received from the mother was, one, suspect; and then, two, when they followed up with me they found that indeed that it was suspect." Nguyen could not recall the specifics of those conversations. Nguyen testified that his opinion about the grandparents' willingness to abide by court orders and agency regulations was based on their court attendance as well as their willingness to participate in team decision making meetings, make their home available for evaluation, undergo background checks, and accommodate changes in the court hearings. Nguyen confirmed, however, that the grandparents had attended only the one team decision making meeting.

The court questioned M.F. extensively about her knowledge of events, including about mother's secretive contacts with father, mother's most recent pregnancy, father's inappropriate relationship with the NREFM caregiver, the circumstances surrounding the parents' prior domestic violence incidents, mother's disappearance with C.C. and eventual

12

return to M.F.'s house, and mother's drug use. M.F. testified that if the circumstances occurred again, she would immediately call someone; she found mother lied to her "quite a bit" and she could not trust mother either with the truth or the children's safety.

*The Juvenile Court's Ruling*

The court denied Agency's motion, ruling Agency had not proved by a preponderance of the evidence that there were changed circumstances with regard to the maternal grandparents and the propriety of the children's placement with them. It explained its ruling in depth, starting by reciting the procedural posture of the case, the parents' domestic violence history and evidence of the maternal grandparents' awareness of some of it, and events leading up to the present hearing. The court acknowledged it was required to give preferential consideration to suitable relatives for placement. However, it observed that while the grandparents had increased the frequency of their visits with the children, it found they were no more greatly interested in the children than they were when the case first came to the court.

Additionally, the court pointed out the grandparents had been "very informed" about mother's domestic violence history and were not only aware that mother had fled with C.C. along with father but also, knowing authorities were actively looking for her, that she was refusing to turn herself in. It observed that once mother returned to the United States, the grandparents permitted her to return to their home, became aware of her pregnancy, and knew that K.C. was detained after her birth. Yet, it found significant that another domestic violence incident had occurred between mother and father in the summer of 2012, which according to the court affirmed "mother's cycle of returning to

13

father" and the fact "much of the domestic violence surrounds the birth of a child, and mother's desire to return to [father]." The court observed that after C.C. and K.C.'s removal from mother and her entry into services, M.F. was in contact with mother on at least a weekly basis and M.F. saw mother was clearly pregnant again in the spring of 2013, but despite asking mother repeatedly M.F. was unable to elicit K.C.'s father's identity. It pointed out the parents were then found together. The court stated that while the maternal grandparents may be aware of mother and father's manipulation, they were also aware of mother's domestic violence history and actions for a long period of time, demonstrating no change in circumstances other than the fact that the grandparents were evasive before, and now claimed they would cooperate with Agency and become engaged in services.

On the grandparents' claim that they were now willing to work with agency, the court pointed out social worker Nguyen could not recall the specific circumstances of M.F.'s cooperation other than a phone call "to check on something in attempting to verify something." As for Nguyen's report that M.F. purported to bar mother from seeing C.C.'s siblings, the court observed that Nguyen had not independently confirmed those actions with the siblings, mother, or anyone else.

Additionally, the court pointed out the grandparents were aware of mother's "volatile and . . . explosive" personality, which was manifested even months after services. The court observed M.F. was present when mother "[went] off" on the social worker who had come to take C.C., the grandparents were aware that mother was upset in February 2011 when she confronted father, and they were aware the parents chose to

14

commit domestic violence in the children's presence, creating a very high risk of danger. The court found "equally significant" and from its observations of the testimony that M.F.'s "view of the problem is that she believes that mother needs to stay away from the father; that, essentially, the father is the source of the problem. There's no doubt that he's a domestic violence perpetrator. He's dishonest. He is manipulative. He violates court orders. [¶] But there is little recognition of the fact that mother, too, has had extremely poor judgment. She's been deceitful. She abandoned two of her own children for an extended period of time to go on the run. She is completely unwilling to abide by court orders. And what is most stunning to the court is essentially [M.F.'s] acceptance. . . . I sat five feet from her, and she appears to be completely accepting that this is essentially the way that mother is. [¶] I quote, '[Mother] has a tendency to do exactly what she wants.' And so, through all of this time, where one grandson is at risk because he is with the parents who have committed domestic violence, [M.F.] accepts mother's explanation [about who the father of her child was and where she was living]." The court acknowledged M.F. had no control over some of the circumstances, but "if you are concerned about the safety of your grandchildren, when asked by law enforcement who are clearly searching for the child or when asked by the social worker, you can identify that you have had contact and give the last—the last bits of information."

The court assessed the grandparents' credibility, particularly M.F.'s. The court found the grandparents "have been aware of mother's complete dishonesty and evasiveness for an extended period of time. And I do not find believable, nor do I find credible, based on my observation of the witnesses, that this is only a recent ability of the

15

grandparents; that only now, they have just in the last month, become able to determine when mother is lying to them." The court found the grandparents were not willing to accept the fact that mother had "significant issues," including her poor judgment and deception, and her willingness to "go[] to the extreme" and put her children in danger by absconding with one and abandoning two others. It pointed out that M.F. had testified she tried to tell mother to turn the child in on multiple occasions while mother was in Spain, and did the same when mother purportedly appeared on her doorstep, but it could not find they were now willing to confront mother: "Apparently, they've been confronting her all along, and apparently she blows them off and ignores them. That's the problem. That's part of the very essential risk in this particular case."

The court's impression of M.F. based on her demeanor on the witness stand was that she was untruthful on some significant points and her instinct all along was to protect mother; M.F. was "still . . . significantly unaware of the real risks in this case that are presented by mother's behavior" and "directly dishonest on some important points regarding the picture regarding the mother and regarding when the marshals had asked to come into her home or not." Accordingly to the court, given M.F.'s "naïve[] accept[ance] of mother's behavior" she "[does not have] the capacity at this point in time to be protective." The court's conclusion extended to maternal step-grandfather D.F.; it observed that the grandparents acted as a unit; that D.F. was residing in the home when the domestic violence incident and mother's arrest occurred, and he was supportive of M.F.

16

The court gave little weight to social worker Nguyen's opinion concerning M.F.'s purported changes in attitude and truthfulness, which was based on one meeting, a phone call, the fact there had been some increased visitation, and M.F.'s creation of a safety plan. It observed that by his own admission Nguyen had little contact with M.F., and she was initially evasive with him. Explaining it had considered the section 361.3 factors, the court observed in part that while the grandparents had met some factors, it had "extreme concerns" about M.F.'s moral character. The court found no evidence that the grandparents could be appropriately protective; though they had means to provide necessities and their home was physically safe, the court could not find they could provide a safe, secure, and stable environment for the children by protecting them from domestic violence and inappropriate conduct.

With respect to the children's best interests, the court found it most important that they be offered a safe, secure and permanent home, but for the reasons it had outlined, it had "very great concerns" about the grandparents' ability to protect the children against their parents and keep them from the children. The court rejected Agency's position that it was in C.C.'s best interest to be placed with the maternal grandparents because he would be able to resume a relationship with his half-siblings; the court found that other than a brief period before he was taken by his mother, C.C. had no visitation with them and had no strong relationship with them, and K.C. had no relationship at all with the siblings. The court noted that while social worker Nguyen testified M.F. was going to spend months away from work and would not put the children in daycare until she was

17

certain they were ready, M.F. testified somewhat differently: that she was taking six weeks off and had already planned for the children's daycare.

Based on all the evidence and its assessment of credibility, and pointing out it was not an easy decision, the juvenile court ruled Agency had not proved by a preponderance of the evidence changed circumstances for the best interests of the children, and denied its section 388 modification petitions. It set the matter for selection and implementation of a permanent plan under section 366.26. Mother appeals from the orders.

## DISCUSSION

### I. *Legal Standards and Standard of Review*

Section 388 provides in part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

On such a motion to change or set aside any prior juvenile court order, the juvenile court must determine whether Agency had demonstrated by a preponderance of the evidence both that there was new evidence or a change of circumstances and that it would promote C.C. and K.C.'s best interests to change, modify or set aside the previous order prohibiting placement with the maternal grandparents. (See *In re Jasmon O.* (1994) 8 Cal.4th 398, 415; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)

18

" '[I]t is not enough for [the petitioner] to show *just* a genuine change of circumstances under the statute. The [petitioner] must show that the undoing of the prior order would be in the best interests of the child.' " (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615; see *In re D.B.* (2013) 217 Cal.App.4th 1080, 1094 [party moving under section 388 cannot simply rely on new evidence that may often arise under the passage of time, the party must show that the change in the order will be in the minor's best interest].)

Further, the petition must show changed, not changing, circumstances. (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615; *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) And "[n]ot every change in circumstance can justify modification of a prior order. [Citation.] The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate. [Citations.] . . . The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

"The petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion." (*In re Jasmon O.*, *supra*, 8 Cal.4th at pp. 415-416.) Under this standard, we do not reverse unless the court's decision exceeds the limits of legal discretion by being arbitrary, capricious, or patently absurd. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 881.) " ' "When two or more inferences can

19

reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' "  (*Stephanie M.*, at p. 319.)

Because Agency's section 388 petition sought a new placement for the children, the juvenile court was required to give the maternal grandparents "preferential consideration" under section 361.3.  (§ 361.3, subd. (a) ["In any case in which a child is removed from the physical custody of his or her parents . . . preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative"]; see also subd. (d) ["Subsequent to the hearing conducted pursuant to Section 358 [the dispositional hearing], whenever a new placement of the child must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements."].)[6]

_____

6    More fully, section 361.3 provides:  "(a) In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . .  In determining whether placement with a relative is appropriate, the county social worker and court shall consider, but shall not be limited to, consideration of all the following factors: [¶] (1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs. [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶] (3) The provisions of part 6 (commencing with Section 7950) of Division 12 of the Family Code regarding relative placement. [¶] (4) Placement of siblings and half siblings in the same home, if that placement is found to be in the best interest of each of the children as provided in Section 16002. [¶] (5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect. [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for and provide legal permanency for, the child if reunification is unsuccessful. [¶] (7) The ability of the relative to do the following: [¶] (A) Provide a safe,

" 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated."  (§ 361.3, subd. (c)(1).)  It is not a relative placement *guarantee* (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 798), and the statute does not create an evidentiary presumption in that relative's favor.  (*In re Antonio G.* (2007) 159 Cal.App.4th 369, 376 ["Preferential consideration 'does not create an evidentiary presumption in favor of a relative, but merely places the relative at the head of the line when the court is determining which placement is in the child's best interests.' "].)

In determining whether relative placement is appropriate, the juvenile court and the Department are to consider, among other factors:  "(1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs. [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶] . . . [¶] (5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect. [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful."

secure, and stable environment for the child. [¶] (B) Exercise proper and effective care and control of the child. [¶] (C) Provide a home and the necessities of life for the child. [¶] (D) Protect the child from his or her parents. [¶] (E) Facilitate court-ordered reunification efforts with the parents. [¶] (F) Facilitate visitation with the child's other relatives. [¶] (G) Facilitate implementation of all elements of the case plan. [¶] (H) Provide legal permanence for the child if reunification fails. [¶] However, any finding made with respect to the factor considered pursuant to this subparagraph and pursuant to subparagraph (G) shall not be the sole basis for precluding preferential placement with a relative. [¶] (I) Arrange for appropriate and safe child care, as necessary."

21

(§ 361.3, subd. (a).) In addition, the court should consider the relative's ability to, among other things, "[p]rovide a safe, secure, and stable environment for the child" and "[p]rotect the child from his or her parents." (§ 361.3, subd. (a)(7).)

"[T]he abuse of discretion standard should be applied to the review on appeal of the juvenile court's determination regarding relative placement pursuant to section 361.3. Such a determination, like decisions in custody cases, involves primarily factual matters and a judgment whether the ruling rests on a reasonable basis." (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067; *Maribel M. v. Superior Court* (1998) 61 Cal.App.4th 1469, 1478 ["Matters such as the placement of the minor . . . are committed to the sound discretion of the juvenile court."].) Thus, as long as the juvenile court's decision was reasonable under the circumstances, it must be affirmed.

## II. *Analysis*

Mother contends the juvenile court abused its discretion by failing to place C.C. and K.C. with the maternal grandparents. She asserts that "the evidence showed the grandparents had resolved their issues and could now ensure the children's safety." She reiterates social worker Nguyen's conclusions that were favorable to the grandparents, including his summary of the positive changes he believed they had made after the team decision making meeting, and his opinion that it was in the children's best interest to place them with the grandparents, in part because they would remain with family and facilitate a relationship with their siblings. She points out Nguyen testified he had reached his conclusions after personally interacting with the grandparents and interviewing them.

22

Mother additionally purports to summarize M.F.'s testimony, stating M.F. testified she understood why the Agency had concerns about her veracity, and admitted her lack of cooperation. Mother points to M.F.'s assurance to the court that she was willing to comply with its orders and the parameters Agency would put into place, and that she felt capable of setting boundaries herself.

Significantly, mother does not dispute that the juvenile court applied the proper test under section 388 and assessed the section 361.3 factors, as well as the children's best interests. Rather, in advancing her argument, she merely focuses on the evidence in her favor and ignores other parts or weaknesses of Nguyen's and M.F.'s testimony. Specifically, mother fails to point out Nguyen testified that since April 2012, he had only "sporadic" and "not regular" contact with the maternal grandparents; that he only saw them in court or would speak with them on the phone if they had questions about the children. She does not mention that Nguyen himself recognized that C.C.'s prior relationship with his siblings was "brief" and that K.C. had no relationship with them, or that Nguyen had not recently spoken with the siblings. Mother fails to acknowledge the juvenile court had concluded there was only one unspecific basis for Nguyen's conclusion about the grandparents' change of attitude, and indeed the record shows Nguyen could not recite the specifics of his conversations or specific reason for his belief that they now could see through the parents' manipulation.

And mother mischaracterizes M.F.'s testimony. M.F. did not admit she had failed to cooperate with Agency in connection with mother's disappearance; rather, she acknowledged that Agency *believed* she had helped mother avoid the Agency. In fact,

23

M.F. continued to deny at the section 388 hearing that she had assisted mother in leaving the country. Under the circumstances, and in view of evidence that M.F. refused police entry into her home after mother was reportedly living there, it was reasonable for the juvenile court to conclude M.F. was "directly dishonest on some important points" regarding her involvement in mother's disappearance.

More fatal to her argument, Mother entirely disregards the juvenile court's credibility calls and its decision to afford little weight to Nguyen's opinions and M.F.'s testimony. She does not attempt to challenge the reasonableness of the juvenile court's finding that Nguyen had only limited support for his opinions, which the court found insufficient to accept Nguyen's conclusions or make a finding of changed circumstances. Mother does not explain why the juvenile court's findings as to the grandparents' level of interest in the children, their limited visits with them, or its conclusion that the grandparents had merely changed what they were saying, are somehow improper or unsupported by the evidence.[7]

---

[7] We note that in her reply brief, mother relies on *In re James W.V.* (2008) 158 Cal.App.4th 1562 and seeks to distinguish it, arguing that unlike that case, there was no reasonable likelihood the grandparents here would permit the parents to have unmonitored contact with the children. Mother argues the evidence—again limiting her discussion to the evidence favoring her—shows the social worker believed the grandparents could handle and set limits with the parents, that the children knew the grandparents, were comfortable with them, and would benefit from placement with them. Having reviewed the record, however, we cannot perceive anything arbitrary, capricious, or unreasonable in the juvenile court's findings as to credibility and weight, and its conclusion that Agency had not shown M.F. was able to keep the children safe and away from their parents.

The question on this appeal is not whether the evidence supports a conclusion contrary to that reached by the juvenile court or whether this court would rule differently; it is whether the juvenile court's findings and conclusions were entirely unsupported or otherwise beyond the scope of its judicial discretion. (See *In re Robert L.*, *supra*, 21 Cal.App.4th at p. 1067 ["[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling."].) Under these circumstances, "[b]road deference must be shown to the trial judge. The reviewing court should interfere only ' "if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did." ' " (*Ibid.*) Absent a meaningful challenge to the juvenile court's ruling under these standards, we have no basis to conclude the juvenile court's decision to discount Nguyen's testimony, disbelieve M.F., and find Agency did not prove the maternal grandparents had the ability to protect the children from mother and father, was arbitrary, capricious, patently absurd, or otherwise a clear abuse of discretion.

DISPOSITION

The orders are affirmed.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.