Filed 5/6/15  In re M.O. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re M.O., a Person Coming Under the Juvenile Court Law. | B258876 (Los Angeles County Super. Ct. No. CK 91951) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> GUSTAVO R., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Anthony Trendacosta, Judge.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Gustavo R. (father) appeals from the juvenile court's order denying his petition under Welfare and Institutions Code section 388[1] and the court's order terminating his parental rights.  We affirm.

### FACTS AND PROCEDURE

In 2013, we filed an unpublished opinion in this matter affirming the juvenile court's orders on a supplemental petition.  (*In re M.O.* (July 23, 2013, B245936).)  We quote pertinent facts from that opinion as follows:

"Mayra O. (mother) gave birth to M.O. in 2012.[2]  The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in February 2012 when mother and newborn M.O. both tested positive for marijuana and amphetamines.

*"1.  Original Petition*

"DCFS filed a petition alleging in pertinent part:  (1) mother's substance abuse endangered M.O.'s physical health and rendered mother incapable of caring for the children (b-2 count); and (2) father had a history of drug use and currently abused marijuana, rendering him incapable of providing care for M.O. (b-3 count).

"Mother admitted to using marijuana, which she had bought on the street, two days before M.O.'s birth.  She thought perhaps it had been laced with amphetamines and that was why she tested positive for amphetamines.  Mother said she used marijuana and 'crystal,' or amphetamines, approximately one to two times per week.  She said she had quit both when she found out she was pregnant but resumed using marijuana approximately seven months into her pregnancy because she could not hold her food down.  She had medication for nausea and vomiting but ran out of it, and she could not obtain another prescription.  She and father read in a book that marijuana could be used

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.

[2]     "Mother also has a daughter, J.G. (born in 2004), who is M.O.'s half sibling.  J.G. is not a subject of this appeal."

2

during pregnancy to help with nausea and vomiting and would not harm the baby. She used amphetamines once while she was pregnant with M.O., a few days before giving birth. Father reported he used marijuana one to two times per week and has a medical marijuana card for 'stress.' Father knew mother used marijuana and did so during her pregnancy because they had read it helped with nausea and vomiting. But he did not know she used amphetamines. Father agreed to stop using marijuana and complete a substance abuse program so that he could retain custody of M.O. Both mother and father agreed to participate in the drug court program. However, a few weeks after the social worker met with the parents to explain the drug court program, father had already missed five group meetings and had not called in to schedule drug testing.

"Mother and father signed a waiver of rights, pleaded no contest, and stipulated there was a factual basis to sustain the petition. . . . [¶] The court sustained the b-2 and b-3 counts of the petition and placed M.O. in father's home under the supervision of DCFS. Mother was to reside with the maternal grandmother and not in father's home. The court ordered father to participate in a drug and alcohol program with testing every other week, parenting classes, and individual counseling. The case plan for father consisted of these services; the plan was signed by father and submitted with his waiver of rights.

*"2. Supplemental Petition*

"Several months after the court adjudicated the original petition, father contacted the social worker asking for help. He had been laid off from work and could not afford his rent and was homeless, though he had been staying some days with his mother (paternal grandmother). Father had not shown up for his drug testing the last nine times and had not participated in any of the court-ordered programs. He said he could not comply with the court orders because of his work schedule, and when he lost his job, he could not comply because he did not have any way to pay for services. Father knew that because he was homeless and had not complied with the court-ordered programs, M.O. would be detained from him. He wanted DCFS to place M.O. in paternal grandmother's home. DCFS said it could not approve paternal grandmother's home because one of the

3

bedrooms was a converted garage, so M.O. was placed with maternal grandparents with the agreement of both parents.

"DCFS filed a supplemental petition under section 387 alleging the previous disposition had not been effective in the protection of M.O. because father (1) was unable and unwilling to provide ongoing care and supervision for M.O. and (2) father failed to participate in court-ordered individual counseling, parenting classes, drug and alcohol counseling, and random drug testing.

"Father told DCFS he agreed M.O. should be detained and placed with maternal grandparents 'because it [was] the best thing' for M.O. at that time. He said he needed time to get 'his stuff together . . . to get a job, start the programs and get a place to live.' DCFS noted it had offered him various services to help comply with the court orders, but still he had not shown any efforts to comply with them. For instance, after father reported he was homeless and had lost his job, DCFS gave him a referral to a specific agency, First 5 LA (First 5), to start services. A First 5 liaison attempted to meet with father three times to assess him for services; he never appeared for the appointments. The social worker finally advised father to contact the liaison himself to schedule an appointment. Father never did that. Maternal grandmother felt father and mother, who had similar issues, were 'not ready to change.' She stated to the social worker: 'It doesn't matter what we do . . . . I don't know what is going to happen for them to change. You give them bus passes, but they don't do anything.'

"Both mother and father eventually started living in a camper parked on a street next to maternal grandmother's home. The camper was not a safe residence for M.O. The parents visited M.O. daily at maternal grandparents' home, and maternal grandparents monitored the visits.

"Father testified at the hearing on the supplemental petition. He wanted M.O. to be returned to his custody. He planned to care for M.O. by moving in with paternal grandmother. He would be getting welfare assistance and was looking for a job. Things had gotten better since he had asked the social worker for help after losing his job. He had taken some parenting classes and participated in a drug program with testing for two

4

to three months, 'on and off,' before the disposition on the original petition. But he had not drug tested since the disposition on the original petition. He had also not done his parenting classes since the disposition, completed the drug and alcohol program, or done individual counseling. He did not show up for his appointments with the First 5 liaison because he did not know how to get there on the bus, but now he knew. Since then, he had not started any classes because he had been trying to find a job.

"The court struck the count of the supplemental petition alleging father was unable and unwilling to provide ongoing care for M.O., but sustained the allegation that father failed to participate in court-ordered individual counseling, parenting classes, drug and alcohol counseling, and random drug testing. The court noted, among other things, that father's explanation for not attending a program or testing (the cost) was not credible because the case was a drug court case, and father was referred to Behavioral Health Services, which meant the services would have been free of charge. The court found the previous disposition was ineffective in the protection of M.O. and terminated the home-of-parent order. Further, pursuant to section 361, subdivision (c), it found continuance in father's home was contrary to M.O.'s welfare, and a substantial danger existed to M.O.'s physical health, safety, and emotional well-being. It ordered family reunification services and unmonitored visits for father, except that DCFS had the discretion to start monitoring father's visits if he did not comply with the case plan within a reasonable period of time. Father filed a timely notice of appeal." (*In re M.O., supra*, B245936.) We affirmed the court's orders terminating the home-of-parent order and removing M.O. from father's care. (*Ibid.*)

### 3. *Review Hearings*

During the first six-month review period, M.O. had remained in the maternal grandparents' home, where his half sister, J.G., was also placed. Father had enrolled in a six-month residential treatment program in January 2013 and had completed two months. As of the review report in March 2013, father had tested negative on 10 random drug tests. Father had also taken parenting classes and had psychotherapy/counseling through the treatment program. Father's counselor described him as "an exceptional client" who

was "working diligently towards his recovery" and had "shown great willingness and motivation." Father picked up M.O. every Sunday and took him to paternal grandparents' home to visit. M.O. was always happy to see father. Maternal grandmother felt father cared for M.O. well during their visits. Father wanted M.O. returned to him and said he was committed to the six-month treatment program. Mother was pregnant again with father's child, and father expressed his wish that the new baby be released to him when he or she was born. The social worker noted that the "current plan" was to release M.O. to father once he had completed his six-month program.

At the scheduled six-month review hearing in March 2013, the court continued the matter to May 2013 for a contested hearing. By April 2013, father had completed three months of the residential treatment program. Father was informed that he needed to complete three more months of the outpatient rehabilitation program. He was also offered group counseling, which was not part of the treatment program. Father refused and said he did not need to continue in the program or in counseling. The social worker's report recommended that the court order father to complete at least three more months of treatment. She noted she had explained to father on at least two occasions that, "due to his extensive drug abuse history," three months was insufficient to prove he had rehabilitated. Moreover, during her visit with father in March 2013 at the residential treatment program, she, father, and his counselor had discussed father's need to complete the six-month program, and he had agreed to complete six months. But father now felt he had done all he needed to do to get M.O. back. Overall, DCFS was recommending that father continue to receive family reunification services. The court terminated reunification services for mother, who had not complied with the case plan, but not father.

In June 2013, DCFS reported father was still insistent that he did not need to complete any other rehabilitation program. He tested negative for drugs and alcohol on May 1, 2013. On the same date, DCFS referred father for random testing, and explained the process to him (i.e., explained that he should call a designated number Sunday through Thursday nights and report to test the following day if the first letter of his last

name was called to test). She further explained that a missed test is considered a positive test, and father indicated he understood. He then missed two tests in May and did not call DCFS to explain why he missed the tests. At a hearing in June 2013, the court ordered father to continue testing and participating in Alcoholics Anonymous/Narcotics Anonymous with a sponsor.

The August 2013 review report indicated father was residing with his mother and sisters, and the home was very clean and well organized. Father had attended 10 Narcotics Anonymous meetings since June. He still had not tested since May 1, however (missing two tests in June and two tests in July), and had not enrolled in any further drug rehabilitation program or individual counseling. Father had been having unmonitored visits with M.O., but because father had not been testing and participating in a program, DCFS was going to require monitored visits. It recommended that the court terminate reunification services for father. At the August hearing, the court found father was not in compliance with the case plan but ordered continued reunification services and set the matter for a 12-month review hearing (§ 366.21, subd. (f).)

The next review report in January 2014 indicated M.O. remained in maternal grandparents' home with J.G. and his newborn sibling, S.O., who was born in September 2013 to mother and father.[3] Maternal grandparents expressed a willingness to adopt M.O. and his siblings if they did not reunify with their parents. Maternal grandmother had quit her job to care for the children. DCFS submitted a new referral for father to resume participation in a drug treatment program through First 5. Father attended a reassessment appointment on November 27, 2013, and scheduled a second reassessment appointment for December 2. He did not show up for this appointment. The First 5 employee with whom father met left a message with father to reschedule, and as of the

---

[3]     DCFS detained S.O. because she tested positive for amphetamines at birth. Mother stated father did not know she had used amphetamines and was angry when he discovered it. In connection with the detention proceedings for S.O., she and father denied that father used amphetamines but reported he had a history of marijuana use.

review report in January 2014, father had not called to reschedule. Father had been drug testing inconsistently. He missed one test in August, tested negative on the second August test, missed one test in September, tested negative on the second September test, and missed both tests in October. He had been visiting with M.O. consistently, though not as often as when visits first started. Paternal aunt would pick up M.O. and take him to paternal grandmother's house, where father was living. Maternal grandmother felt father and the paternal relatives cared well for M.O. during visits. At the January 2014 hearing, the court found father was not complying with the case plan, terminated reunification services for him, and set the matter for a permanency planning hearing (§ 366.26).

### 4. Section 388 Petition

At the scheduled permanency planning hearing in May 2014, the court continued the matter to August 4, 2014. On August 1, 2014, father filed a petition under section 388 to change the order terminating his reunification services. The petition asserted father had enrolled in a 12-to-18 month, in-patient drug treatment program on May 8, 2014, where he was participating in parenting classes, relapse prevention seminars, individual counseling, and drug testing. He was in phase 2A of the four-phase program. His counselor said that, "[s]o far, he ha[d] a good attitude towards his treatment and participate[d] in all structure," and he was "learning about himself and his co-dependent behaviors." He had participated in 12 parenting classes, 12 art therapy classes, 11 yoga sessions, three relapse prevention seminars, and 11 "seeking safety classes." He had tested randomly four times, all with negative results. The petition requested that the court take the permanency planning hearing off calendar and give him six more months of reunification services and unmonitored visits. Father argued these changes "would be better for" M.O. because he had spent the first eight months of his life with father and had bonded with him. M.O.'s counsel and DCFS both opposed the petition.

The court denied the petition, noting that, at two years into the case, "there's no more reunification services to be had." It found the evidence did not support father's

assertion of changed circumstances, and moreover, it was not in M.O.'s best interests to grant the petition.

## 5. *Termination of Parental Rights*

In September 2014, the court terminated mother's and father's parental rights. It found M.O. adoptable by clear and convincing evidence. The court designated maternal grandparents as the prospective adoptive parents. Father timely appealed from the order terminating parental rights and the order denying the section 388 petition.

## DISCUSSION

Father contends the court erred in denying his section 388 petition to reinstate reunification services, and as a result, we should vacate the subsequent order terminating his parental rights. We disagree.

Section 388 permits a parent of a dependent child to petition the court "to change, modify, or set aside any order of court previously made" based on a "change of circumstance or new evidence." (§ 388, subd. (a)(1).) "A ruling on a section 388 petition is 'committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.]' [Citation.] Thus, we may not reverse unless the juvenile court exceeded the bounds of reason, and we have no authority to substitute our decision for that of the lower court where two or more inferences can reasonably be deduced from the facts." (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1088-1089.)

The moving party has the burden of proving, by a preponderance of the evidence, (1) changed circumstances or new evidence and (2) the change in the court order would be in the best interests of the dependent child. (§ 388, subds. (a)(1), (d); *In re D.B., supra*, 217 Cal.App.4th at p. 1089.) The moving party must show a substantial, significant, and genuine change in circumstances. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529; *In re Heraclio A.* (1996) 42 Cal.App.4th 569, 577; *Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 485.) Overall, the court considers "the seriousness of the reason for the dependency and the reason the problem was not overcome; the relative strength of the parent-child and child-caretaker bonds and the

9

length of time the child has been in the system; and the nature of the change in circumstances, the ease by which the change could be achieved, and the reason the change was not made sooner." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 446-447.)

The reason for dependency here—illegal drug use—was relatively serious. (See *In re Kimberly F., supra*, 56 Cal.App.4th at p. 522 ["[T]he reason for the dependency [(an unsanitary home)] was not as serious as other, more typical reasons for dependency jurisdiction, such as sexual abuse, physical abuse or illegal drug use . . . ."].) Moreover, father's own choices were the reason he did not overcome this problem. During the period of reunification services, father's participation in services fluctuated, and he was mostly noncompliant. After he consented to jurisdiction in April 2012, he did not comply with the case plan; he did not drug test and he did not participate in a drug treatment program. He failed to attend his appointments with the First 5 liaison. After the court sustained the supplemental petition and removed M.O. from his home in November 2012, he went through a period of compliance with the case plan. He completed three months of a six-month treatment program and participated in parenting classes and counseling. But after those three months, he refused to finish the program and engage in more counseling. He also began missing drug tests, even though the social worker explained to him that a missed test was equivalent to a positive test. Thus, in August 2013, the court found he was not complying with the case plan. Still, the court refrained from terminating reunification services. By the time of the review hearing in January 2014, he was not in compliance still. He had not re-engaged in a treatment program, again missed an appointment with First 5, and had missed four of six drug tests. The court justifiably terminated reunification services at that point and set the matter for a permanency planning hearing.

Further, the factors relating to the change—the nature of the change, the ease with which father could have achieved the change, and the reason he did not make the change sooner—supported the court's denial of the petition. Five months after the court terminated reunification services, father enrolled in a drug treatment program, which included the other components of his previous case plan (parenting classes, individual

10

counseling, and drug testing).  He had been in the program for three months when he filed the section 388 petition.  While this was a superficial change from the previous period of noncompliance with the case plan, we cannot say it was a significant or substantial change in the overall scheme of the case.  This circumstance had occurred before, insofar as father had previously completed three months in a program, only to abandon the program and fail to drug test.  In discussing the relative seriousness of the reasons for dependency, the court in *Kimberly F.* noted the difficulty of finding genuinely changed circumstances in a case like this.  The court explained:  "[W]e doubt that a parent who sexually abused his or her child could ever show a sufficient change of circumstances to warrant granting a section 388 motion.  Likewise the parent who loses custody of a child because of the consumption of illegal drugs and whose compliance with a reunification plan is incomplete during the reunification period.  It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform."  (*In re Kimberly F., supra*, 56 Cal.App.4th at p. 531, fn. 9.)

Additionally, father did not provide any good reason why he could not have re-enrolled in a treatment program sooner, i.e., before the court terminated reunification services in January 2014, or even at some point between January and May 2014.  Similarly, he did not describe any difficulties that might have barred his way, and it therefore seems he could have made the change with relative ease, especially because he had referrals from DCFS and failed to take advantage of that.

Lastly, if we look at the factors going to the best interests of the child—the relative strength of the parent-child and child-caretaker bonds and the length of time the child has been in the system—these factors also supported the denial of the petition.  When father filed the petition in August 2014, M.O. had been in the dependency system for the entirety of his life, approximately two years six months.  Father argues he and M.O. were bonded, especially because he cared for M.O. from the time he was born in February 2012 to November 2012, when M.O. was placed with maternal grandparents.  But by the time of the section 388 petition in August 2014, M.O. had been living with maternal grandparents consistently for approximately one year nine months, well over half his life.

11

His siblings also lived with the maternal grandparents.  Maternal grandparents wanted to adopt all three children, and maternal grandmother had quit her job to be their caretaker.  The court had terminated father's reunification services long before he filed the petition.  "After reunification services have been terminated, the parents' interest in the care, custody and companionship of the child are no longer of overriding concern.  [Citation.]  The focus then shifts to the child's need for permanency and stability, and there is a rebuttable presumption that continued foster care is in the child's best interests.  [Citations.]  . . . When, as here, the permanent plan is adoption, that presumption is even more difficult to overcome."  (*In re Aaliyah R., supra*, 136 Cal.App.4th at pp. 448-449.)  The juvenile court could properly look to M.O.'s need for permanency and stability in denying father's section 388 petition to take the permanency planning hearing off calendar and reinstate reunification services.

The court did not abuse its discretion in denying the petition.  Father's argument to vacate the order terminating parental rights is premised on his argument that the court abused its discretion in denying the petition.  Given that we disagree with that foundational premise, we also decline to reverse the order terminating parental rights.

**DISPOSITION**

The orders are affirmed.


FLIER, J.

WE CONCUR:



RUBIN, Acting P. J.



GRIMES, J.


12