Filed 2/10/16  In re A.C. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,  Plaintiff and Respondent,  v.  MELINDA C.,  Defendant and Appellant. | G052384  (Super. Ct. Nos. DP023872, CK79030)  O P I N I O N |

Appeal from a judgment and orders of the Superior Court of Orange County, Dennis J. Keough, Judge.  Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*　　　　\*　　　　\*

Appellant claims the juvenile court erred in not granting her a hearing on her petition to change an order and in terminating her parental rights. Finding no error, we affirm the judgment and orders.

I

FACTS

We filed our first nonpublished opinion (*Melinda C. v. Superior Court,*(May 13, 2015, G051618)) in a petition for writ of mandate proceeding in which we denied the mother Melinda C.'s petition under Welfare and Institutions Code section 387 contesting the juvenile court's orders to remove the minor A.C. from her custody and set a hearing to terminate her parental rights. (All further statutory references are to the Welfare and Institutions Code.) We filed a second nonpublished opinion (*In re M.L.* (October 23, 2015, G051625)) in which we affirmed the juvenile court's order denying the mother's petition under section 388 to modify its order setting a hearing pursuant to section 366.26 to terminate her parental rights over M.L, the minor's half sibling.

In the present appeal, the mother is appealing the denial of her request to change a court order under section 388, and the termination of her parental rights to the minor.

In ourfirst opinion, we stated the following facts: "The minor, A.C., now three years old, was born with a positive toxicology screen for amphetamine and methampthetamine. The Los Angeles Superior Court declared A.C. a dependent child of the juvenile court. She was put under the care of the Department of Children and Family Services, placed in a licensed foster home at first and later in the home of a maternal aunt.

"The minor's mother Melinda C., the petitioner here, argues the juvenile court lacked substantial evidence the minor would be at risk if returned to her. The minor's father, Adrian R., has a history of substance abuse and as of June 2012 'is a

2

current abuser of methamphetamine, marijuana, alcohol and pain medication.'  Both parents have long criminal histories.

"A dependency petition filed on behalf of the minor's half sibling M.L. was sustained in 2009 because petitioner 'created an endangering home environment for the child in that excessive pornographic materials, including videos and magazines belonging to the maternal grandfather, were found in the child's home. . . .'  Petitioner 'has an unresolved history of substance abuse and is an abuser of methamphetamine . . . .'  Petitioner and M.L.'s father Marc L. have a history of 'domestic violence in the child's presence . . . .'  After family reunification in the case involving M.L. was terminated in 2011, the juvenile court ordered a guardianship and permanent placement services for M.L.

"With regard to petitioner and the minor, the juvenile court ordered family reunification services for petitioner.  No reunification services were ordered for the father.

"On June 3, 2013, the Los Angeles Juvenile Court ordered the minor placed with petitioner.  Shortly thereafter, when the minor was 13 months old, petitioner moved into the home of the relative caregiver and the minor in Orange County, and the case was transferred to Orange County.  On June 25, 2013, the minor was declared a dependent child of Orange County Juvenile Court.

"A few weeks after the minor's second birthday, the mother missed some drug tests.  Shortly thereafter, she tested positive for methamphetamine.  The mother admitted to a social worker she used methamphetamine.  Then on August 19, 2014, 'the mother submitted a diluted test.'  On July 3, 2014, a protective custody warrant was issued by the juvenile court to remove the minor from the custody of petitioner.  The social worker was also concerned the child had been taken by petitioner and the maternal aunt to the home of her maternal grandfather, the man who endangered the welfare of the minor's half sibling.

3

"Petitioner was sent to a new residential treatment program. The therapist reported 'the mother refrained from answering questions about the past' and the therapist expressed if there were no improvements, petitioner would have to move on to a different therapist. With regard to petitioner's visitations with the minor, the caregiver stated to a social worker: 'They're going alright. Melinda plays with her, but if [A.C.] cries, I'll have to tell her to comfort her. She won't do it on her own.' Petitioner claimed she was 'too tired' to comfort the minor. In August 2014, the social worker reported: '[T]he prognosis for this case is poor. It appears appropriate for the child, [A.C.], to remain in out-of-home care. It is respectfully recommended that the Court continue dependency, with no Family Reunification services offered to the child's mother . . . .'

"Petitioner was sent to a new therapist who reported petitioner's insight was limited. Later, the therapist stated about the petitioner: 'On the surface, everything is there. She's on time. She talks. It might not be possible for her to connect the dots on a deeper level . . . I feel she means well. We just aren't getting there.'

"On July 8, 2014, a supplemental petition pursuant to section 387 was filed. Some of the allegations in the supplemental petition, as interlineated by the juvenile court, state: 'On June 21, 2014, the mother, Melinda [C.], tested positive for methamphetamine. On July 3, 2014, the mother, Melinda [C.], initially reported she is still taking Oxycodone from a surgery that she had on May 13, 2014, and believed that was the cause of her positive test for methamphetamine. The mother's prescription medication would not cause a positive result for methamphetamine. In the evening of July 3, 2014, the mother admitted she used methamphetamine on one occasion, and that she missed her drug test that day. [¶] The mother has missed the following drug tests: January 31, 2014; February 22, 2014 (due to being out of town); February 28, 2014; May 13, 2014 (due to having surgery for gallstones); June 3, 2014; and June 24, 2014.'

"On March 5, 2015, the juvenile court found the allegations in the supplemental petition to be true by a preponderance of evidence 'bringing the child

4

within the provisions of section(s) 387 of the W&I Code.'  The juvenile court expressed concern about petitioner's 'series of missed tests.'  The court also commented:  'One of the concerns that the court had in listening to testimony was a certain amorphous or a fuzziness regarding mother's present living situation.'  Further, the court found that both petitioner and the maternal aunt lacked credibility, particularly with regard to going to the maternal grandfather's house.  The court found the time for reunification services had lapsed.  The juvenile court found by clear and convincing evidence that section 361, subdivision (c)(1) applies.  A hearing pursuant to section 366.26 is calendared for July 6, 2015."

In the second opinion, we stated the following facts:  "The minor was born in 2002.She was declared a dependent of the Los Angeles County Juvenile Court on February 3, 2010.  On August 16, 2011, the Los Angeles Juvenile Court conducted a hearing pursuant to section 366.26, and Mr. and Mrs. C. were granted guardianship over the minor on September 30, 2011.  'On December 15, 2011, Los Angeles County Juvenile Court ordered proceedings transferred to Orange County based on "legal guardian resides in Orange County."'  On May 4, 2012, the Orange County Juvenile Court ordered minor 'declared a dependent child of Orange County Juvenile Court.'

"In an August 15, 2012 status report, the Orange County Social Services Agency (SSA) reported:  'The child's mother has been granted two supervised visits per month with the child.  The caretaker reported that she allows the child's mother to visit the child at the placement whenever the mother wants, provided that the child's mother schedules the visit at a reasonable time and with enough notice.  The child's mother has not requested a visit with the child at all since Orange County Juvenile Court accepted jurisdiction over the case.  The child's mother did call the child one time; however, the child's mother called the child after the child's bedtime and the child was asleep.'

"In September 2012, Mr. C. contacted SSA to say the minor's maternal aunt and maternal grandmother had moved from the home of the maternal grandfather,

5

and the minor wanted to live with her family. He further informed SSA that it was never Mr. and Mrs. C.'s intention to keep the minor from her family.

"Thus, SSA scheduled a meeting to discuss whether or not the legal guardianship granted to Mr. and Mrs. C. should be set aside. At the meeting on September 20, 2012 were Mr. and Mrs. C., the minor's maternal aunt and maternal grandmother, the social worker and a facilitator. No resolution was reached, and after the meeting, the social worker reported to the court: 'The undersigned has concerns about the child being placed with her maternal relatives . . . .' SSA recommended that all existing orders remain in place. Afterward, Mr. and Mrs. C. expressed ambivalence about setting the guardianship aside 'as they do not want the child to end up in the foster system.'

"In a February 14, 2013 report, SSA stated the mother calls the minor periodically, but the calls were only about once a month. SSA also reported: 'The child's mother has only visited the child once, despite having weekend passes from the facility where she lives and despite visiting her younger daughter on those weekends.' With regard to other maternal relatives, SSA states in the same report: 'Since expressing a desire to have the child placed with them, the child's maternal aunt . . . and the maternal grandmother . . . have only visited the child twice and have not called her. In fact, the legal guardian reported that although the child was invited to one birthday party on the maternal relatives' side of the family which she attended, the child was not invited to two other birthday parties the family has had.' Additionally, SSA requested the maternal relatives complete a Livescan, prepared the paperwork for them and explained the process to them, but they never followed through.

"On February 15, 2013, the juvenile court found the permanent plan of legal guardianship was appropriate and ordered it to be continued. But due to Mr. and Mrs. C.'s desire to set aside their legal guardianship, SSA explored other family members who were not part of the maternal family. The minor's paternal grandmother expressed

willingness to take custody of the minor, and the minor said she wished to live with her. Mrs. C. reported the paternal grandmother was visiting the minor once a week, and calling her once or twice a week.

"An August 8, 2013 SSA report states the mother did telephone the minor as well, but Mrs. C. terminated it when the mother told the minor she was going to have a new daddy and wanted the minor to speak with her current boyfriend. The mother also visited the minor in July 2013, and the minor enjoyed her visit, 'and wished her mother would visit more often.'

"The paternal grandmother expressed interest in adopting the minor. SSA stated in its report: 'The undersigned has been transitioning the child to living with her paternal grandmother with extended 3-4 day visits. The legal guardians stated that they support the placement with the paternal grandmother as she seems to care and love the child. Reportedly, the child enjoys her time with her grandmother and there were no concerns. The undersigned plans to place the child immediately with her paternal grandmother once Court grants setting aside guardianship.'

"With regard to the minor's half sibling, A.C.'s paternal grandmother telephoned SSA on August 12, 2013 and 'expressed concern that the mother is struggling financially and may not be able to support and raise [A.C.] as [A.C.'s paternal grandmother] needs to buy the child diapers and wipes. Reportedly, the mother becomes really depressed at times and cannot get out of bed.'

"Meanwhile, the minor reported she was happy living with her paternal grandmother. The paternal grandmother also reported she was happy with the minor, and that she enrolled her in a nearby school.

"The mother was permitted more frequent and unmonitored visitation with the minor, but because she took the child to see the maternal grandfather, SSA once again reduced the number of visits and required they be monitored. On one occasion, the mother asked the minor to return birthday and Christmas presents she had given her.

7

"The mother missed her drug tests on January 31, 2014, and on March 19, 2014, the paternal grandmother reported the mother only visited the minor once in February.

"On August 8, 2013, the juvenile court dissolved the guardianship, and granted SSA's request to place the minor with her paternal grandmother. SSA recommended to the court that the permanent plan was no longer appropriate, and requested that a hearing under section 366.26 be scheduled. On September 23, 2013, the juvenile court set a hearing under section 366.26 for October 23, 2013. The hearing was continued many times and did not commence until January 21, 2014.

"During a pre-adoption physical examination of the paternal grandmother in April 2014, she found out she has throat cancer. After the paternal grandmother's throat cancer was discovered, SSA recommended a 60-day trial visit of the minor with the mother, and the court authorized that visit on May 6, 2014. The visit commenced on June 10, 2014. On June 30, 2014, SSA attempted an unannounced visit to see the minor at the mother's home, but no one answered the door. A relative reported the minor was with the maternal grandmother, which was in the same home the child had previously been removed from due to the presence of pornographic materials.

"On May 9, 2014, the mother's therapist reported the mother completed seven sessions of therapy, but the therapist had seen no progress in that 'the mother is argumentative and sometimes falls asleep during session.' On May 13, 2014, the minor had a home visit with the mother for Mother's Day, but the minor later reported she was left with her mother's friend while the mother went to a nightclub.

"The mother missed two drug tests in June 2014 and tested positive for methamphetamines on a third drug test. Thus, in July 2014, half sibling A.C. was removed from the mother's home. And, SSA found the mother had failed the trial 60-day test visit with the minor, and the minor was returned to the paternal grandmother.

"SSA reported to the court in July 2014 the paternal grandmother was unable to either adopt or become the minor's guardian. SSA's recommendation to the court was: '[R]emoval of the child from the physical custody of the relative would be detrimental to the emotional well-being of the child because the child has substantial psychological ties to the relative. It is further recommended that the Court order that the child remain in long-term foster care.'

"Meanwhile, during an August 2014 visit between the mother and the minor, the mother informed the child she wanted to hang herself. It does not appear this incident of inappropriate behavior was a fluke. The previous April, the minor reported the mother and her sister engaged in arguments in front of the minor, and the minor's Mother's Day visit was disrupted when the mother left the child with a friend while she went to a nightclub. The previous December and January, the mother made the child cry on several occasions. During the summer of 2013, as noted above, the mother tried to have the minor speak with her latest boyfriend on the telephone. In July 2014, one of the mother's arguments with her sister resulted in a physical altercation. In December 2014, in a pizza restaurant, the mother was on the telephone for one hour and 15 minutes, ignoring the minor. Minor's half sibling A.C.'s paternal grandmother reported that when the minor was 10 years old, the mother told her, 'if I have to live without you I'm going to kill myself.'

*"Section 388 Motion*

"On March 2, 2015, the mother filed a motion under section 388, requesting the juvenile court to change its order to conduct a hearing under section 366.26. In an attached declaration, the mother declared: 'Since my relapse in July, 2014, I have committed myself to my sobriety and acknowledge the mistakes I have made. I have maintained my sobriety for nearly 7 months now.' 'I am requesting return of my daughter to my care because I am ready, willing and able to accept full responsibility for

9

my daughter's care.' Attached to the motion are numerous certificates of completion of various programs.

"With regard to whether or not the mother made a sufficient prima facie showing to warrant a hearing of her section 388 motion, the court stated: 'I believe mother has shown a change of circumstances and has argued best interests in her [section] 388 [motion].' Thereafter, the juvenile court ordered that the evidence for both the hearing on the section 388 motion and the section 366.26 proceedings would be heard and considered at the same time.

"After hearing several days of testimony and receiving numerous exhibits, the juvenile court concluded, based on clear and convincing evidence the minor's placement is necessary and appropriate, that it is likely the minor will be adopted, that the provisions of section 366.26, subdivisions (c)(1)(A) and (B)(i)(ii)(iii) and (iv) do not apply. The juvenile court stated the child looks to her paternal grandmother for a sense of security, and that circumstances are changing, 'rather than changed,' and denied the section 388 motion. Regarding the section 366.26 hearing, the court ordered that parental rights be terminated, the minor be placed for adoption, and that the minor and half sibling A.C. not be placed together."

Since our previous opinion in the minor's case, and prior to the section 366.26 hearing, SSA submitted a report to the court on June 23, 2015. That report states the child is still with her paternal relative, has been there for a year and appears to have adjusted quite well to the placement, noting that "all of the child's needs are being met and the relative caretakers are interested in providing adoption for the child."The report states: "The child is a member of a sibling set, but is not placed with any of her siblings. One of her siblings is a court dependent. This sibling is placed with a different relative who plans to adopt as well."SSA concluded it is likely the minor will be adopted and recommended the juvenile court terminate the mother's parental rights.

10

On July 9, 2015, the mother filed a petition pursuant to section 388 requesting the juvenile court change its order. The petition states: "[S]he has maintained sobriety, has obtained stable housing and employment over the past 364 days." That same day, the juvenile court heard arguments regarding conducting a hearing on the mother's section 388 petition, the court noted it was aware "that 388s are to be liberally construed." The court ruled: "And notwithstanding that rule of construction, the court cannot find that a prima facie case has been set forth in the 388 petition." In explaining its ruling not to conduct a hearing because circumstances had not changed, the juvenile court went into detail about some of the continuing problems, emphasizing the mother's long history of drug use, the therapist's concern about the mother's lack of insight and the number of times the minor had been taken to a home "which raise very serious concerns" about her safety and welfare.

At the section 366.26 hearing, conducted immediately after the section 388 petition was denied without a hearing, SSA's report was admitted into evidence and the mother was called as a witness. The juvenile court found the mother made regular and consistent visits, but that they were the visits "of a friendly visitor." The juvenile court stated: "And so the court is going to note . . . the child is three . . . to the extent the wishes of the child can be derived, the court has considered the wishes of the child, again consistent with the child's age, and all findings and orders are made in the best interests of the child. [¶] The court would find the child's placement is necessary and appropriate. Again, the court has previously found and would reiterate its finding that it is likely that the child will be adopted, and the court makes those findings by clear and convincing evidence. [¶] The court would find the provisions of 366.26 (c)(1)(A) and 366.26 (c)(1)(B) (i) (ii) (iii) (iv) (v) and (vi) do not apply. The court would find that termination of parental rights and placement of the child for adoption to be in the minor's best interests. And accordingly, the court would terminate the parental rights of [the father] and [the mother], and order [the minor] placed for adoption."

11

## II

## DISCUSSION

The mother contends the juvenile court erred when it denied her section 388 petition without a hearing. County counsel counters that the mother made no showing that her circumstances changed or that return of the minor to her would promote the minor's best interests.

A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 316–317.) A parent need only make a prima facie showing of these elements to trigger the right to a hearing on a section 388 petition and the petition should "be liberally construed in favor of granting a hearing to consider the parent's request." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309–310.)

However, if the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition. (*In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1450–1451; *In re Edward H.* (1996) 43 Cal.App.4th 584, 592-594.)The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition.(*Id.* at p. 594.)

A ruling on a section 388 petition is "committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuseofdiscretion is clearly established." (*In re Stephanie M., supra,* 7 Cal.4th at p. 318.) "Thus, we may not reverse unless the juvenile court exceeded the bounds of reason, and we have no authority to substitute our decision for that of the lower court where two or

12

more inferences can reasonably be deduced from the facts."(*In re D.B.* (2013) 217 Cal.App.4th 1080, 1088-1089.)

The juvenile court made a finding there were no changed circumstances, and discussed the mother's ongoing and continued drug use and lack of insight.  The juvenile court also made a finding that termination was in the best interests of the minor, noting the court's concern for the safety and welfare of the minor because the mother repeatedly took her to a dangerous home.  Under the circumstances found in this record, we cannot conclude the juvenile court abused its discretion when it denied a hearing on the mother's section 388 petition.

The mother also argues on appeal that she and the minor had a strong bond that arose from birth and continued to develop and remain strong, and the juvenile court should have applied the parental bond exception in section 366.26, subdivision (c)(1)(B)(i).

There is a statutory preference under section 366.26 to terminate parental rights and order a child placed for adoption, which is just what the juvenile court ordered in this matter.  (*In re C.B.* (2010) 190 Cal.App.4th 102, 121-122.)  There is an exception to that statutory preference, for which the parent bears the burden of proof, if the juvenile court finds termination would be detrimental to the child because the parent has maintained regular visitation and contact with the child, and that the child would benefit from the continuing relationship.  (§ 366.26, subd. (c)(1)(B)(i); *In re C.B.,* at pp. 123-124.)

"If the court's ruling is supported by substantialevidence, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights under section 366.26, subdivision (c)." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 396.)The type of parent-child relationship sufficient to derail the statutory preference for adoption is one in which "regular visits and contact have continued or developed a

13

significant, positive, emotional attachment from child to parent." (*In re Autumn H.*(1994)27 Cal.App.4th 567, 575.)

The parental relationship exception also requires that the juvenile court find that the existence of the parent-child relationship constitutes a compelling reason for determining that termination would be detrimental to the child, a finding which is based on facts, but not primarily a factual issue. "It is, instead, a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315.)

In the present action, with regard to the necessary statutory finding the parent maintained regular visitation and contact with the child, the juvenile court stated the interaction between the mother and the minor was that "of a friendly visitor."In January 2015, the mother was on her phone and not interacting with the minor during visits,and as late as July 2015, there was a report the mother's interaction with the minor during her weekly visits was limited.On the other hand, the minor is well adjusted in her current placement with the prospective adoptive parents,who have been the minor's daily caretakers since July 2014.SSA reported to the court the prospective adoptive parents "worked hard to integrate the child into their lives by modifying their daily schedules to meet her needs."We find no evidence from which we caninfer that any detriment would flow from a cessation of contact between the mother and the minor. Nor do we find the juvenile court erred when it applied the statutory preference for termination of parental rights and placement of the minor for adoption.

Under the circumstances we find in this record, we conclude there is substantial evidence to support the juvenile court's findings, orders and judgment. We also conclude the juvenile court did not abuse its discretion.

III

DISPOSITION

The judgment and orders of the juvenile court are affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.